Thomas F. CURTIS, Petitioner,

v.

J. E. BINDEMAN, Robert E. Martin and Charles B. Fisher, individually and as members of the Board of Elections of the District of Columbia, Respondents,

and

Charles I. Cassell, Intervenor.

No. 5138.

District of Columbia Court of Appeals.

Argued Dec. 22, 1969.

Decided Jan. 14, 1970.

Charles H. Mayer, Washington, D. C., for petitioner. Lewis H. Shapiro, Washington,

---

5. *See* State v. Cerce, 22 N.J. 236, 125 A.2d 689 (1956); State v. Leo, 80 N.J.L. 21, 77 A. 523 (1910).

D. C., also filed an appearance for petitioner.

John R. Hess, Asst. Corp. Counsel, with whom Charles T. Duncan, Corp. Counsel, Hubert B. Pair, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for respondents.

Albert J. Beveridge, III, Washington, D. C., for intervenor. Frank E. Samuel, Jr., Washington, D. C., also filed an appearance for intervenor.

Before KERN, GALLAGHER and NEBEKER, Associate Judges.

NEBEKER, Associate Judge:

This case comes before the court on a petition to review the election on November 4, 1969, of Charles I. Cassell, intervenor,[1] an at-large candidate for the Board of Education of the District of Columbia.[2] The petition, together with a motion for stay, was timely filed on November 25, 1969. A pre-hearing conference and a hearing on the merits were held on an expedited basis. Action on the motion for a stay has been held in abeyance pending this decision on the merits of the petition.[3]

D.C.Code 1967, § 1–1111(b) (Supp. II, 1969)[4] permits any person who voted to petition for review of the election within seven days after the Board of Elections certifies the results. It is uncontested that petitioner is qualified to file the petition as a person who voted in the election. Section 1–1111(b) empowers this court to set aside the certified results and declare the "true results" or void the election. Petitioner does not assert that the election should be declared void, and from the material before the court, we conclude that there are no issues of fraud, mistake, improper expenditures by a candidate, or other serious defect vitiating the election as an expression of the will of the voters. Petitioner requests that the court "set aside the results" as certified and permit the result to be based on his conception of all valid votes.

Petitioner attacks two decisions of the Board of Elections. The first decision we consider is its decision to count several hundred challenged ballots which, it is contended, are invalid because they were "cast" in voting precincts in which the voters were not registered, in contravention of D.C.Code 1967, § 1–1109(b) (Supp. II, 1969). The second decision gives rise to the contention that the Board of Elections incorrectly refused to count

1. The unopposed motion for leave to intervene was granted prior to any other action by the court and intervenor has been fully heard on the brief and in all proceedings before the count.

2. *See* D.C.Code 1967, § 31–101 et seq. (Supp. II, 1969).

3. By operation of § 31–101(b) (3), *supra*, Mr. Cassell is certified to take office on January 26, 1970. The object of the requested stay was to prevent him from taking office, pending this review.

4. That section provides:
   Within seven days after the Board certifies the results of an election, any person who voted in the election may petition the District of Columbia Court of Appeals to review such election. In response to such a petition, the court may set aside the results so certified and declare the true results of the election, or void the election in whole or in part. To determine the true results of an election the court may order a recount or take other appropriate action, whether or not a recount has been conducted or requested pursuant to subsection (a). The court shall void an election only for fraud, mistake, the making of expenditures by a candidate in violation of this chapter, or other defect, serious enough to vitiate the election as a fair expression of the will of the registered qualified electors voting therein. If the court voids an election it may order a special election, which shall be conducted in such manner (comparable to that prescribed for regular elections), and at such time, as the Board shall prescribe. The decision of such court shall be final and not appealable.

about 173 absentee and "shut-in" [5] ballots because they were postmarked after election day—from November 5 to November 10, 1969. These uncounted ballots have been preserved, unopened, pursuant to D. C.Code 1967, § 1–1109(d).

The Board of Elections certified intervenor with 12,410 votes as the winner. Petitioner received 12,390 votes. Had the several hundred challenged ballots not been counted petitioner asserts that he would have been elected by a total of 11,952 votes against intervenor's 11,917 [6]—a 35-vote margin in his favor. He accepts the possibility that if he prevails on both his contentions he may still lose the election if this 35-vote margin were to be overcome when the 173 absentee ballots are counted.

I

■ Petitioner's contention that several hundred ballots were improperly counted is grounded on his interpretation of the first sentence of D.C.Code 1967, § 1–1109(b) (Supp. II, 1969).[7] Petitioner urges that the statute requires a voter to mark his ballot in his residence precinct and there deposit it. We think, however, that § 1–1109(b), *supra,* should not be read so narrowly. The statute should be liberally construed so as not to deny innocent voters their right to vote, or to upset an election for technical reasons. Of course, such approach must be made with a view to insuring that the results are not fraught with dishonesty or the appearance of unreliability. *See* Application of Wene, 26 N.J.Super. 363, 97 A.2d 748 (1953).

■ A substantial majority of the persons permitted to mark their ballot at a precinct other than their residence precinct were employees of the Board, police officers and others who were working at the various precinct locations.[8] Thereafter, these ballots were assigned to and counted by the Board as if they had actually been marked and deposited ·in the residence precinct of the voter. At the suggestion of the court during the prehearing conference, an investigation was undertaken to determine whether any of these several hundred voters had also gone to their precinct and voted a second time in violation of D.C.Code 1967, § 1–1109(g). We are advised, and it is undisputed, that there were no instances of double voting.

It is the position of the Board that compliance with the "cast" requirement of § 1–1109(b), *supra,* was achieved when the Board treated the ballots as if marked and deposited in the resident precinct. We conclude that the Board, under these circumstances, insured that the votes were "cast in the voting precinct where the residence shown on [the voters] registration is located." We do not think it was intended that § 1–1109(b) should be read so narrowly as to preclude the Board from adopting a reliable system to accommodate legitimately displaced voters. In doing so the Board was able to insure against double voting and had a reasonable basis for accommodating the voters in question.[9] To

---

5. Hereinafter referred to, for convenience only, as absentee ballots.

6. Because of our decision we need not reach the issue whether this count is otherwise correct, and possessed of sufficient legal significance to reflect "the true results of the election". *See* n. 4, *supra.*

7. That section provides:
   The vote of a person who is registered as a resident of the District shall be valid only if cast in the voting precinct where the residence shown on his registration is located. The Board shall by regulation permit voting by any registered elector who is absent from the District or who, because of his physical condition, is unable to vote in person at the polling place in his voting precinct on election day.

8. According to the record of the Board, a few challenged ballots were from persons who had moved from one precinct to another without notifying the Board.

9. We note that most of these voters were in some way aiding in the operation of the election process.

construe the section as strictly as petitioner does would seem to run contrary to its apparent over-all purpose of insuring as wide an electorate as possible consistent with a system calculated to guarantee reliability of the returns. An examination of the legislative history does not reveal a contrary intent by Congress. *See* H.R.Rep. No. 606, 84th Cong., 1st Sess (1955); S.Rep. No. 695, 84th Cong., 1st Sess (1955). Indeed, it is apparent the second sentence of this section providing for absentee voting is governed by the "cast" requirement of the first sentence. Such absentee votes must also be "cast" *i.e.,* counted in the residence precinct of the voter. The Board is obviously empowered and even required to "cast" such votes for those voters. It follows that it might do so for the voters in question provided reliability is preserved. Accordingly, we hold that these several hundred ballots were not erroneously counted. There being nothing incorrect in the certified results on this point we have no reason to set them aside to declare "the true results of the election." *See* § 1–1111 (b), *supra*.[10]

■ The Board's refusal to count the 173 absentee ballots [11] presents considerably different considerations. Under § 1–1109(b), *supra,* the Board adopted a regulation requiring that "all absentee ballots must be postmarked not later than the day of the election * * *." However, just prior to the election the Election Board became embroiled in two suits regarding the form of the ballot for the Board of Education election. In re Haworth, D.C.App., 258 A.2d 447 (1969), was decided by this court on October 24, 1969, on an expedited basis to accommodate timely printing and distribution of the ballots. On October 30, 1969, an action was filed in the United States District Court for the District of Columbia raising the issue whether the ballots should contain space for write-in candidates. The matter was finally resolved in favor of write-in space by the United States Court of Appeals on the evening of Saturday, November 1, 1969.[12] As a result

10. Petitioner also contends that the Board acted inconsistently in refusing to count some 50 other ballots by voters who went to the wrong precinct and used the wrong ballot. His point is that at least the "at-large" part of the ballot, as distinguished from the patently improper "ward seat" portion, should have been counted; particularly in view of the fact that the several hundred other ballots referred to above were counted. In the first place § 1–1109(c) permits a voter whose ballot is challenged and not counted by the Board to appeal within five days to the District of Columbia Court of General Sessions and its decision thereon is final. No such remedy was pursued in these cases, and no reason appears suggesting that such procedure was not available to the voters or any candidate including petitioner if he so desired. This is quite unlike the situation discussed in n. 15, *infra.* In any event, it has not been made to appear under the circumstances that the Board acted unlawfully in refusing to count these 50 ballots. The ballots contained names of ward candidates for whom the voters were ineligible to vote by virtue of residence in another ward and were thus improperly used. The need to maintain the integrity of the election result by use of reliable and manageable voting procedures must prevail against the voter who appears at the wrong precinct and uses the wrong ballot.

11. *See* n. 5 and accompaning text. Of the 173 ballots, about 85% were so-called "shut-ins", and the remainder were voted by absentees.

12. It appears that none of the parties to that action considered whether this court was a more appropriate tribunal to decide the issue. Clearly, under 28 U.S.C. § 1651, this court, in aid of its jurisdiction to review the election pursuant to § 1–1111(b), *supra,* had power to determine an "all writs" petition addressed to the question raised before the United States District Court. The United States Court of Appeals appears to have recognized the difficulty in having the Board of Elections involved in litigation in both local and federal courts at election time. Its order specifically provided:
"Nothing herein shall be construed to derogate from the authority of the District of Columbia Court of Appeals under D.C.Code 1967, § 1–1111 to review the elections." Bardyl R. Tirana v. The District of Columbia Board of Elections, Civil Action No. 3109–69; U.S.C.A. No. 23,606; Court of Appeals Order dated November 1, 1969.

the Board was unable to mail absentee ballots until Sunday, November 2, 1969, at about 6:10 p. m. The Executive Secretary caused employees of the Board to instruct absentee voters, through an enclosed instruction sheet,[13] that the ballot must be returned by November 10, 1969,[14] but no mention was made in the instruction of the requirement in the Board's regulations that the ballots be postmarked on election day. It is contended that this instruction misled those voters who could have mailed the ballots back by election day into believing they had additional time in which to mark and mail their ballots. Moreover, it is also observed that many ballots were no doubt received by the voters *after* election day, and that this was not their fault or that of the Board. Somewhat inconsistent with his contention regarding the several hundred ballots of displaced voters, petitioner here asserts that:

The right of suffrage is an extremely important civil right * * *. Yet, under the Board's present ruling one hundred and seventy-three voters are being deprived of their statutory right to vote through no fault of their own and solely as the result of good faith reliance on the respondent Board's instructions.

We think that under the unique circumstances here presented, petitioner is correct and the Board should count these ballots. There is nothing to indicate that in doing so the "true results of the election" will in anyway be clouded. Indeed, lingering doubt about the "true results" will be eliminated. Since there is no statutory prescription regarding the time by which absentee ballots must be marked, postmarked, or received, the question is one of administration at the Board level. We think that the Board should not have disenfranchised those voters whose votes otherwise appear valid, and who relied on the Board's instructions to their detriment.

Accordingly, we direct the Board to count these unopened ballots as promptly as possible and to follow its usual procedure in doing so. The Board is also directed to notify this court of the results of said count and its effect on the results of the election as presently certified. In this way the court may know whether to permit the present certification to stand or to set it aside and declare the true results of the election.[15] We retain jurisdiction of the case pending further order of the court. The clerk is directed to forthwith transmit a certified copy of the judgment and a copy of this opinion in lieu of mandate to the Board.[16]

So ordered.

13. The sheet was one from a previous election which was up-dated by a stamp indicating a date change.

14. This was to some extent consistent with the Board's regulation requiring absentee ballots to be returned "not later than 5:00 p. m. EST on the sixth day following the election."

15. We do not read § 1–1109(e), *supra*, as precluding such an order by this court. That section, while providing an appeal to the Court of General Sessions from Board refusal to count a challenged ballot, requires that the initial appeal from a refusal to count a ballot be taken to the Board "within three days after election day." A strict and limited time schedule is provided for all subsequent steps, including final appeal to the Court of General Sessions. However, many of these 173 ballots were not even received by the Board within the initial three-day period, and certainly the voters had no timely notice of their disenfranchisement. Therefore, we issue our judgment in aid of our jurisdiction under § 1–1111(b) which permits this court to determine the true results of the election by taking "other appropriate action." *See also* D.C.Code 1967, §§ 1–1510 and 17–306.

16. We are confident that with the experience gained from dealing with the problems which have arisen in past elections the Board will see the wisdom of anticipating areas of possible difficulty and of adopting regulations necessary to meet the task. *See* D.C.Code 1967, § 1–1105(c). In the course of adopting or amending existing regulations, the Board, as an independent agency, D.C. Code 1967, § 1–1106, must hereafter follow the provision of D.C.Code 1967, § 1–1501 et seq. (Supp. II, 1969), the District of Columbia Administrative Procedure Act, effective October 21, 1969.