Sandy ALLEN, Walter Glover and
Roderick Liggens, Petitioners,

v.

DISTRICT OF COLUMBIA BOARD
OF ELECTIONS AND ETHICS,
Respondent,

Eydie Whittington and Council of the
District of Columbia, Intervenors.

No. 95–AA–595.

District of Columbia Court of Appeals.

Argued July 21, 1995.
Decided Aug. 4, 1995.

Richard E. Messick, with whom Karen J. Malachi, was on the brief, for petitioners.

William H. Lewis, with whom Alice P. McCrory–Miller, was on the brief, for respondent.

Michelle D. Bernard, with whom Paul M. Thomas and Richard J. Nirzzardini were on the brief, for intervenor Eydie Whittington.

Before STEADMAN, SCHWELB and REID, Associate Judges.

SCHWELB, Associate Judge:

In this case, we must resolve a controversy over an extraordinarily close election. Following an evidentiary hearing, the District of Columbia Board of Elections and Ethics held that Eydie Whittington was the victorious candidate, by a single vote, in the May 2, 1995 special election to choose a member of the Council of the District of Columbia for Ward 8. That seat had become vacant when the former Councilmember from that ward, Marion Barry, was elected Mayor.

Ms. Whittington's principal adversary, petitioner Sandy Allen, together with petitioners Walter Glover and Roderick Liggens, two residents of Ward 8 who supported Ms. Allen's candidacy, have asked this court to review the Board's decision. Petitioners request that Ms. Allen be declared the winner of the election or, in the alternative, that the court order a new election or a run-off between Ms. Whittington and Ms. Allen, the two candidates who received the greatest number of votes.

Although petitioners challenged the qualifications of several additional voters in the proceedings before the Board, their only substantive claim[1] in this court is that four named individuals voted "fraudulently" and illegally, that their ballots should not have been counted, and that without their votes Ms. Whittington would not have been victorious. Finding no error in the Board's conclusion that petitioners failed to prove their allegations, we affirm.

## I.

## PROCEDURAL HISTORY

This election was so close that, even aside from the alleged irregularities, it was impossible for a considerable period of time to determine who had won in the official count. The initial unofficial tabulation of the ballots reflected that Ms. Allen had prevailed by one vote. After the "special" ballots and absentee ballots had been tabulated, however, Ms. Whittington was declared to be the winner by two votes.

Ms. Allen demanded a recount and, on May 15, 1995, a judge of the Superior Court entered an order restraining the Board from certifying Ms. Whittington as the winner of the election until seven days after a recount had been completed. On May 18, 1995, the requested recount was duly conducted. Ms. Whittington's margin shrank by 50%, but she was declared to be the victorious candidate, now by one vote.

Petitioners asked the Board to stay its certification of Ms. Whittington's victory. They alleged, *inter alia*, that a number of persons ineligible to vote in Ward 8 had cast ballots in the election. The Board declined to stay its decision, and Ms. Allen and her supporters immediately filed a petition for review in this court and requested the court to stay the Board's order.

On May 24, 1995, this court issued an interim stay to enable it to consider the issues before it. On May 30, 1995, after further consideration, the court vacated the stay, explaining that it was doing so in order to provide the residents of Ward 8 with representation on the Council. In its order, the court directed the Board to consider, on an expedited basis, the factual and legal issues raised by petitioners.

On June 7, 1995, the Board held an evidentiary hearing in which counsel for the Board, for petitioners, and for Ms. Whittington as intervenor all participated. On June 13, 1995, the Board held in a written decision that petitioners had failed to prove any of their allegations by a preponderance of the evidence.[2] Petitioners now challenge that ruling.

1. Petitioners also assert that the Board's decision should be set aside because the Board's "prejudged the evidence." But "[j]udicial rulings alone almost never constitute valid basis for a bias or partiality motion." *Liteky v. United States,* — U.S. —, —, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994); *see also* L. MODJESKA, ADMINISTRATIVE LAW: PRACTICE AND PROCEDURE § 4.16, at 135–36 (1982) (applying rule to administrative agencies). There is no evidence, in this record, of bias from an "extrajudicial" source (or its administrative analogue), *see Chapman v. U.S. Commodity Futures Trading Comm'n,* 788 F.2d 408, 411 (7th Cir.1986) (per curiam), nor is there any suggestion that the Board had it "in" for petitioners. *See McLaughlin v. Union Oil Co. of Cal.,* 869 F.2d 1039, 1047 (7th Cir.1989).

 This case bears no resemblance to *Eilers v. District of Columbia Bureau of Motor Vehicles Servs.,* 583 A.2d 677 (D.C.1990), on which petitioners rely. In *Eilers,* the hearing examiner, *inter alia,* declared that he was "convinced" that Eilers had committed a traffic offense before the defense testimony was presented, and he then asked if there was anything in "mitigation" before the defense had an opportunity to argue the merits. *Id.* at 686–88.

2. In Part IIIB of this opinion, we discuss in some detail the question whether "preponderance of the evidence" was the correct standard of proof.

## II.

## THE EVIDENCE

### A. Background

At the Board's evidentiary hearing, counsel for petitioners framed her opening statement in dramatic terms:

> I cannot stress the magnitude of the Board's burden in this proceeding. This is a case of election theft. We [will present] evidence that people outside of Ward 8 are trying to steal this election, trying to deny Ward residents their true voice in the City Council.

Petitioners, in other words, were not alleging that innocent errors by the Board or by individual voters had cost Ms. Allen the election. On the contrary, they claimed before the Board, and continue to maintain in this court, that the Whittington camp had engaged in a pattern of fraudulent conduct to obtain the seat on the Council which rightfully belonged to Ms. Allen.

Petitioners attempted to redeem the promise in counsel's opening statement with proof that nine persons, several of them associated with the Whittington campaign, had illegally cast ballots although they were not residents of Ward 8. Petitioners have, however, now abandoned their previous claims as to five of the nine voters.[3] Petitioners' position in this court is that the Board erred in holding that their proof failed with respect to four voters, namely Walter Masters, Anthony Richardson, Lolita Senn, and Charles Ashmon.

Petitioners' principal witness at the hearing was retired Detective Dan L. Dazzo, who served for many years with the Metropolitan Police Department, but who is now a private investigator. Dazzo's firm was retained by the Allen campaign to investigate allegations of voting by unqualified persons. Dazzo testified at some length regarding the investigation which he conducted.

The Board in its written opinion, and individual members of the Board at the hearing, expressed some reservations as to Dazzo's persuasiveness and credibility as a witness, in part because he relied for some of his assertions on sources whom he declined to identify,[4] and in part because, by selectively disclosing information to persons whom he interviewed, he may have conveyed the impression that he was a police detective when in fact he was a private citizen.[5]

### B. Walter Masters

Walter Masters, the brother of Mrs. Cora Masters Barry and the brother-in-law of Mayor Barry, served as the field operations coordinator for Ms. Whittington's campaign. Petitioners claimed at the Board hearing that Masters was a resident of Florida at the time of the May 2 election, and that he was therefore ineligible to vote in Ward 8. Ms. Whittington submitted a sworn declaration by Mr. Masters, together with supporting documentation, in which Masters stated, *inter alia,* that he had been a resident of the District since 1994. Petitioners do not now press the claim that Masters lived in Florida in May, 1995.[6] They contend instead, on the basis of Masters' sworn declaration,[7] that he voted in the wrong precinct and that his vote should not have been counted.

---

3. The only testimony presented as to three of the nine was that there was no answer at his or her residence on the single occasion that petitioners' investigator visited it.

4. At one point in his testimony, Dazzo said that his source was the Police Department of Las Vegas, Nevada, but that agency apparently supplied information only as to a single voter. Petitioners are no longer asserting that this voter was ineligible to vote.

5. Dazzo testified that he did not volunteer to interviewees that he was a *private* investigator or that he was working for the Allen campaign. Instead, he identified himself as "Detective" Daz-

zo, sometimes in writing. He also carried, and displayed to persons whom he interrogated, a Metropolitan Police Department badge which has the words "Retired" stamped on it, but which by his own admission, "looks like a police badge." He professed to have "no idea" whether a citizen who saw this badge would believe that he was a police officer rather than a private investigator.

6. A very substantial part of the hearing was devoted to this now-abandoned claim.

7. Masters did not swear to his declaration before a notary public, but represented that he was making it under penalties of perjury.

Masters registered on March 11, 1995, listing his address as 1911 Savannah Street, S.E., in Ward 8. He stated in his declaration that he terminated his lease at Savannah Street on April 30, 1995 for financial reasons, and that he moved in with his sister and brother-in-law on Raleigh Street, S.E., an address which is also located in Ward 8. Although he had physically moved prior to the May 2 election, he represented in his declaration that he

> voted at Precinct No. 116, which is the Precinct for the Savannah Street residence, because I had not yet formally changed my address with the Board to reflect the fact that I had moved to the Raleigh Street residence until May 4, 1995.

Petitioners contend that the foregoing constituted an acknowledgment by Masters that he voted in a precinct in which he did not live, and that his vote therefore violated the National Voter Registration Act Conforming Amendment Act of 1994, D.C.Code § 1–1311(i)(1) (Supp.1995), as well as the Board's applicable regulation, 3 DCMR § 710.6 (1990).

The Board did not address this argument in its decision, evidently because it was not made to the Board.[8] In its brief in this court, however, the Board contends that the challenge to Masters' ballot is precluded by *Curtis v. Bindeman,* 261 A.2d 515 (D.C. 1970). In *Curtis,* this court rejected an argument similar to the one pressed here by petitioners because, *inter alia,* "[t]he statute should be liberally construed so as not to deny innocent voters their right to vote, or to upset an election for technical reasons." *Id.* at 517. The court added that "[t]o construe the section as strictly as petitioner does would seem to run contrary to its apparent over-all purpose of insuring as wide an electorate as possible consistent with a system calculated to guarantee reliability of the returns." *Id.* at 517–18.

8. See discussion at Part IIIA, *infra.*

9. The address of Whittington's campaign headquarters was listed on Whittingtons' campaign records as Richardson's address. The evidence showed, however, that this was done by campaign personnel for administrative convenience.

### C. Anthony Richardson

Anthony Richardson was also an employee of Ms. Whittington's campaign. He apparently served as Ms. Whittington's "bodyguard." Richardson signed a sworn change of address form on March 13, 1995, listing his new address as 1911 Savannah Street, S.E., Apt. 104. This was the address of the apartment leased by Walter Masters.

Investigator Dazzo testified that he went to the Savannah Street address in order to determine if Masters lived there, but that no one was at home. He stated that a neighbor who lived across the hall told him that the occupant of the apartment had moved out before election day. According to Dazzo, this woman, as well as a second neighbor to whom Dazzo also spoke, "made no mention" of an Anthony Richardson living there. Dazzo acknowledged, however, that he was there to investigate facts relating to Masters, not to Richardson, and that he did not ask these neighbors any questions about Richardson.

In their brief in this court, petitioners also rely on Masters' lease, which was introduced into evidence by Ms. Whittington's counsel. The lease proscribes residence in the apartment by anyone other than the listed occupants, namely, Masters, his wife, and his son. Petitioners now contend that if Richardson had resided at the Savannah Street address, this would have been in violation of the terms of Masters' lease. This contention was not raised before the Board, perhaps because counsel for petitioners were unaware of the provisions of the lease until opposing counsel introduced it into evidence.[9]

In its written decision, the Board made only perfunctory findings as to Richardson.[10] The Board also stated, erroneously, that "Mr. Dazzo admitted that this evidence was inconclusive as to his residence." In its post-hearing brief, the Board contends that the neighbors' failure to volunteer information regarding Richardson and the absence of Richardson's name from Masters' lease were

10. It should be noted that the Board had to deal with claims relating to nine voters and with a contention, now abandoned, relating to the Board's failure to hold a biennial canvass.

insufficient to overcome Richardson's sworn statement, made at the time he registered, that he lived at the specified address.

### D. Lolita Senn

Lolita Senn was registered to vote on Bates Street, N.W., which is outside Ward 8, prior to May 2, 1995. On election day, she changed her registration to 3228 15th Place, S.E. in Ward 8. After swearing that the 15th Place address was her residence, Ms. Senn cast her ballot in Ward 8.

Investigator Dazzo testified that he spoke to Ms. Senn on May 20, 1995 at 3228 15th Place. He described the conversation as follows:

> I asked her if she lived at that address, and she replied that she was staying at that address. From my experience, when someone says—there is a difference when they say staying and living, so I asked her to clarify for me. She said that she used to live on Bates Street in Northwest, 229 Bates Street. It was being reconditioned, and when it was done, she was going to move back in there.

Dazzo added that she did not "identify whose house she was staying at." He likewise provided no information as to whether the residence at which Ms. Senn "used to live" was owned or rented, or as to when she proposed to "move back in there."

In its written decision, the Board briefly summarized Dazzo's testimony regarding Ms. Senn. The Board stated (erroneously, as in Richardson's case) that "Mr. Dazzo admitted this evidence was inconclusive as to [her] residence." In its post-hearing brief, the Board argues that Dazzo's subjective opinion that there is a difference between "staying" and "living" was insufficient to support a finding that Ms. Senn had cast her ballot unlawfully.

### E. Charles G. Ashmon

On election day, Charles G. Ashmon executed a "Voter's Affirmation" in which he swore that he lived at 1345 Barnaby Terrace, S.E., in Ward 8. He listed his prior address as 158 R Street, N.E., which is in another ward. On March 17, 1995, he applied for renewal of his driver's license, listing the R Street address.

Investigator Dazzo visited Ashmon's Ward 8 address on May 20, 1995, but found nobody at home. A neighbor advised Dazzo that someone was living at the residence, but the neighbor did not know that person's name. Dazzo did not have a description of Mr. Ashmon, who was 66 years old. Dazzo acknowledged that his investigation of Ashmon's address was inconclusive. In its written decision, the Board held that petitioners "have not met their burden to establish that Mr. Ashmon was not a resident of Ward 8 on May 2, 1995."

In their brief in this court, petitioners rely primarily on an affidavit filed in this court by petitioner Sandy Allen on May 22, 1995, more than two weeks before the June 7 hearing. In that affidavit, Ms. Allen asserted that she had known Ashmon for many years. She stated that she spoke with Ashmon on election day, and that he told her that he did not live in Ward 8 but that he owned property there. Ms. Allen was present during a part of the hearing before the Board, but she did not testify. No other information about Mr. Ashmon was provided.

In its brief in this court, the Board points out that although petitioners made a general request at the beginning of the evidentiary hearing that previous affidavits filed with the court be made part of the record, no specific reference was made at any time during the hearing to the allegations regarding Ashmon in Ms. Allen's affidavit. Dazzo, as the petitioners' principal witness, surely knew or should have known of Ms. Allen's alleged conversation with Ashmon at the time that he stated that his investigation as to Ashmon was inconclusive. The Board contends that "it would be unreasonable ... to adopt the petitioners' argument that it was clear that Mr. Ashmon did not live in Ward 8 based solely on the hearsay declaration in Sandy Allen's affidavit, whose bias and motivations are not above reproach."

### III.

### LEGAL DISCUSSION

#### A. Standard of Review

In our consideration of the Board's disposition of this closely contested election,

the scope of our review is limited. We must accept the Board's findings of fact so long as they are supported by substantial evidence on the record as a whole. *Pendleton v. District of Columbia Bd. of Elections & Ethics,* 449 A.2d 301, 307 (D.C.1982); D.C.Code § 1–1510(a)(3)(E) (1992). "[W]e do not review the record of an administrative proceeding *de novo* but, rather, examine the record to determine whether the agency could reasonably have found the facts as it did." *Pendleton, supra,* 449 A.2d at 307 (citation omitted). Deference to the Board's findings is especially appropriate where, as here, the decision was based in part on its assessment of the credibility of the witnesses, including Dazzo. *Stewart v. District of Columbia Dep't of Employment Servs.,* 606 A.2d 1350, 1353 (D.C.1992).[11]

■ Insofar as the Board's legal conclusions are concerned, we must defer to its interpretation of the statute which it administers, and, especially, of the regulations which it has promulgated, so long as that interpretation is not plainly wrong or inconsistent with the legislative purpose. *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Pendleton, supra,* 449 A.2d at 307; *see also Kennedy v. District of Columbia,* 654 A.2d 847, 853–54 (D.C.1994).

■ Where the Board has certified the result of an election, that certification is not lightly set aside. In election contests, "it is the duty of the court to validate the election if possible. That is to say, the election must be held valid unless plainly illegal." *Wilks v. Mouton,* 42 Cal.3d 400, 229 Cal.Rptr. 1, 722 P.2d 187, 189 (1986) (en banc) *cert. denied,* 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987) (quoting *Rideout v. City of Los Angeles,* 185 Cal. 426, 197 P. 74, 75 (1921)). Accordingly,

"[e]very reasonable presumption will be indulged in favor of the validity of an election. The ballots received and counted by duly authorized officers are presumed to be legal. *This presumption carries with it the further presumption that these voters were legally qualified.*

*Leasure v. Beebe,* 83 A.2d 117, 120 (Del.Ch. 1951) (citations omitted; emphasis added); *see also Beck v. City of Cincinnati,* 162 Ohio St. 473, 124 N.E.2d 120, 122 (1955); 26 AM. JUR.2D *Elections* § 343, at 162 (1966 & Supp. 1995); 29 C.J.S. *Elections,* § 274, at 737–38 (1965 & Supp.1995). The party contesting the election therefore has the burden to prove its illegality. The Board's certification was not conclusive, but was *prima facie* evidence that the challenged votes were good, and threw the burden of proof on the petitioners. *United States ex rel. Weightman v. Carbery,* 2 D.C. (2 Cranch.) 358, 360–61 (C.C.D.C.1822); *see also Wilks, supra,* 722 P.2d at 190 (citations omitted) (requiring proof by clear and convincing evidence); 26 AM.JUR.2D *Elections, supra,* § 342, at 161, and authorities cited *id.* n. 2.

Finally, "[i]n the absence of exceptional circumstances, this court will not entertain contentions not raised before the agency." *Glenbrook Rd. Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 605 A.2d 22, 33 (D.C.1992) (citation omitted). In the present case, as we have noted, a number of petitioners' contentions in this court were not presented to the Board. In some instances, the circumstances were arguably "exceptional," and the failure to raise the issue may have been excusable. Apparently, for example, petitioners were not apprised of Masters' lease until counsel for Ms. Whittington introduced it into evidence. There was no time for closing argument, and it would perhaps have been difficult for petitioners' attorney to present to the Board, on a moment's notice, the contention that Masters' lease barred Richardson's residence. Ms. Allen's affidavit

---

11. As Judge Jerome Frank noted for the court in *Broadcast Music, Inc. v. Havana Madrid Restaurant Corp.,* 175 F.2d 77 (2d Cir.1949),

[a] stenographic transcript correct in every detail fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the words

signify. The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried.

*Id.* at 80 (quoting ULMAN, THE JUDGE TAKES THE STAND 267 (1933)); *see also Stewart, supra,* 606 A.2d at 1353 n. 5.

regarding Ashmon's alleged admission that he did not live in Ward 8, on the other hand, was available to petitioners more than two weeks before the hearing, and petitioners' failure to address it in Dazzo's testimony or elsewhere in their presentation effectively precluded the Board and opposing counsel from inquiring into the subject.

### B. Statutory Background and Burden of Proof

■ Our election statute provides in pertinent part that the court shall "void an election only for fraud, mistake ... or other defect, serious enough to vitiate the election as a fair expression of the will of the registered qualified electors voting therein." D.C.Code § 1–1315(b) (1992). Before the Board, as we have seen, petitioners cast their argument in terms of "fraud" and claimed that Ms. Whittington's camp had tried to steal the election. In this court, petitioners claim in their brief to have "found that four individuals, including two of Ms. Whittington's campaign employees, fraudulently voted." Fraud must be proved by clear and convincing evidence. *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C.1992).

■ To sustain their case as they have framed it, petitioners were required to show that one or more of the challenged voters made a willful misrepresentation to the Board, known by that voter to be false, and that he or she did so with the intent to deceive the Board and to induce the Board to permit him or her to vote unlawfully. *Id.* (detailing elements of fraud). The Board having ruled against them on their allegations of fraud, petitioners must now demonstrate to this court that the Board acted unreasonably or arbitrarily in finding that fraud had not been proved. Stated another way, petitioners must show that the record,

viewed in the light most favorable to Ms. Whittington, *compelled* a finding, by clear and convincing evidence, that one or more of the challenged voters voted fraudulently. Any objective review of the record demonstrates that petitioners have fallen short of proving that a finding of willful fraud is mandated by the evidence, or that no impartial trier of fact could reasonably find otherwise.

■ Notwithstanding the manner in which petitioners have articulated their argument, however, the Board apparently focused on the closer question whether, short of fraud, the record reveals some other "defect serious enough to vitiate the election as a fair expression of the [electorate's] will." D.C.Code § 1–1315(b).[12] We so conclude because the Board analyzed the record to determine whether petitioners had proved their case by a preponderance of the evidence. The Board's utilization of this standard, notwithstanding petitioners' focus on alleged "fraud," suggests that the Board, recognizing the public interest in vindicating the will of the electorate, did not treat this case as one in which relief could be awarded only if intentional misrepresentation was established. Rather, the Board apparently examined the record to determine whether petitioners had shown that the election did not fairly express the will of the properly registered electors. No party has objected to this approach.

### C. The Four Challenged Voters

Essentially, the result in this case is dictated by the standard of review and the burden of proof. At most, petitioners have raised some suspicion that one or more of the challenged individuals voted illegally. They have not proved more than that. Assuming, *arguendo*, that notwithstanding the applicable presumptions, the Board could reasonably have found that any of the four were ineligi-

---

**12.** As the court stated in *Johnson v. Russell*, 161 Kan. 203, 166 P.2d 568 (1946),

an election contest is not merely a proceeding for the settlement of private rights. It is a proceeding in which the people—the public—are primarily concerned. Ours is not a government of rival claimants to an office nor of office-holders. It is a government of the people. Their interest and right is to be represent-

ed by those whom they have chosen to be their public servants. That interest and right is something rival claimants to an office cannot barter away.

Id., 166 P.2d at 571; *see also Garrison v. Rourke*, 32 Cal.2d 430, 196 P.2d 884, 889 (1948) (en banc); *Henley v. Elmore County*, 72 Idaho 374, 242 P.2d 855, 859 (1952).

ble to vote, we cannot say that the Board acted unreasonably in rejecting any of the challenges.

### 1. Walter Masters

■ We assume, without deciding, that under the unusual circumstances of this case, see part IIIA, *supra*, petitioners may properly argue in this court that Masters' ballot should be disqualified on the ground that he voted in the wrong precinct, even though this argument was not made in the proceedings before the Board. On that assumption, we are presented with the situation of a voter who moved out of his old residence on April 30, 1995, even though, according to his declaration, he had the right to remain there until May 4. The election was held on May 2, a date on which he was, for practical purposes, between two residences. There is no suggestion that Masters voted twice, and the vote totals would have been the same if Masters had cast his ballot in a different precinct.

On these facts, the Board reasonably relied on *Curtis v. Bindeman, supra.*[13] We agree with the following discussion in the Board's brief:

> Petitioners' argument portends dire consequences for the realities of the mobile urban life style, where it is common for voters to move from one apartment to another. Specifically, in special ward only elections, if, after the Board's records are closed for filing changes of address (the D.C.Code mandates that the registry closes for all purposes 30 days before an election), a voter moves from one location to another *within the ward*, but votes in the former precinct *within the ward*, [he or she] would be disenfranchised. *Bindeman* appears to reject that crabbed reading of the franchise. Granted, the statute permits a voter to make an election day change of address (EDCA). However, under the rationale of *Bindeman*, whether Mr. Masters exercised this option in this special ward only election would have been

of no moment. Both of the addresses in question are in Ward 8. . . .

\* \* \* \* \* \*

Walter Masters, himself, is irrelevant. Rather, the precedent set by this Court for the electorate as a whole in future elections is where the focus must lie. The franchise should not be interpreted so as to return to the pre-Voting Rights Act of 1965 days, where voting, in many instances, was tantamount to an obstacle course game of "Gotcha." In a ward only special election where the risks of voter fraud are minuscule, voters who are in all respects validly registered in the ward, and where there is no evidence of double voting, should not be [disfranchised] for failure to vote in the correct precinct. Since Mr. Masters was validly registered, the fact that he might have voted in the wrong precinct in a ward only election cannot affect the outcome of the election.

### 2. Anthony Richardson

■ On March 13, 1995, Anthony Richardson swore on his change-of-address form that he lived at 1911 Savannah Street, S.E., Apt. 4. The presumption that his sworn representation was truthful was not overcome by the failure of two neighbors to volunteer his name to petitioners' investigator, or by Masters' failure to include Richardson's name on the lease. At the very least, the Board could reasonably so conclude.

### 3. Lolita Senn

■ The only evidence tending to show that Ms. Senn was not a resident of Ward 8 was her alleged statement to Dazzo that she was "staying" at her residence in that ward while the Bates Street residence, at which she "used to live," was being reconditioned. Dazzo provided no other information about either residence, or about Ms. Senn's relationship to it. On election day, Ms. Senn swore that "my date of birth and current residence address in this precinct are shown above."

---

**13.** We do not believe that either the enactment of statutory amendments since *Curtis* was decided or the absence of any pressing need for Masters to vote at his old precinct (when he could have voted at his new one) should trump the underlying rationale of *Curtis*, namely, that the court should not "upset an election" on such a ground. *Curtis, supra*, 261 A.2d at 517.

Petitioners ask us to hold that Ms. Senn's actual residence was the place at which she said she used to live, and to disfranchise Ms. Senn and invalidate the election, all essentially on the basis of Dazzo's interpretation of the word "stay," standing alone. To conclude, on the basis of such limited information, that Dazzo's subjective impression overcomes Ms. Senn's oath would be, in our view, altogether unjustified. The Board reasonably declined to do so.

### 4. Charles Ashmon

 Like Ms. Senn, Charles Ashmon swore on election day that "my date of birth and current residence address in this precinct are shown above." Investigator Dazzo did not find Ashmon at home when he made his sole trip to Ashmon's Ward 8 residence. As Dazzo himself acknowledged, however, this surely did not prove that Ashmon did not live at the address. Dazzo knew nothing else about Ashmon.

 Neither counsel for petitioners nor Dazzo mentioned Ms. Allen's more than two-week-old affidavit during the hearing before the Board.[14] We are reluctant under these circumstances to consider a contention which was not meaningfully presented to the agency. The members of the Board, who participated actively in the interrogation of Dazzo and other witnesses, had no opportunity to inquire into, or comment upon, Ms. Allen's affidavit. There was likewise little or no occasion for Ms. Whittington's attorney to address the point.

In any event, the burden of proof as to Ashmon was on petitioners. The Board could reasonably decline to credit an affidavit by the contending candidate (describing what someone else allegedly said to her) over the sworn statement of the voter himself.

## IV.

## CONCLUSION

For the foregoing reasons, the decision of the Board certifying Eydie Whittington as the winner of the May 2, 1995 special election for member of the Council from Ward 8 is hereby

*Affirmed.*[15]

---

14. Curiously, in their brief in this court, petitioners fault *the Board* for overlooking Ms. Allen's affidavit.

15. We deal briefly with several other contentions presented by petitioners.

The persons whose right to vote was challenged were given notice of the Board hearing one week in advance. Petitioners claim that the failure of each to appear constitutes an admission or quasi-admission of non-residency, or at least strengthens their challenge to the non-appearing voter's qualifications.

The record does not disclose whether these individuals were employed, or even in the Washington, D.C. area, at the time of the hearing. Many citizens would doubtless be reluctant, more than a month after the election, to take a day off from work or from other activities to attend such a proceeding. There might be a variety of reasons for not attending, and the notion that a voter stayed away because he or she had no response to petitioners' allegations is altogether speculative. Not a single one of the nine voters who were initially challenged appeared at the hearing. Petitioners have now effectively conceded that they had no case as to five of them. We conclude that it was reasonable for the Board not to accord any weight to these individuals' non-attendance.

Petitioners point out that the Board incorrectly attributed to Mr. Dazzo a concession that the evidence as to both Mr. Richardson and Ms. Senn was inconclusive. Given our assessment of the record, however, these errors—which were apparently made at a time when no transcript was available to the Board—were plainly harmless.

Finally, petitioners maintain that the evidence that the challenged voters were non-residents of Ward 8 was so clear that the Board erred in turning to a "complex, multifactor analysis" of their residence. *See* D.C.Code § 1–1302(16)(A) & (B) (1992). We have concluded that the evidence of non-residence was anything but clear, and find no error by the Board in this regard.