Anthony A. WILLIAMS, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF ELECTIONS AND ETHICS,
Respondent.

Dorothy A. Brizill, Shaun Snyder,
Gary Imhoff, and Mark
Sibley, Intervenors.

No. 02–AA–854.

District of Columbia Court of Appeals.

Argued Aug. 6, 2002.
Decided Aug. 7, 2002.
As Corrected Aug. 14, 2002.

 

**PER CURIAM:**

Anthony Williams, the Mayor of the District of Columbia, petitions for review of a decision of the District of Columbia Board of Elections and Ethics (the Board) denying him a place on the ballot for the Democratic mayoral primary election scheduled for September 10, 2002.[1] The Mayor's principal argument before us is that the Board exceeded its authority in categorically excluding the signatures contained on nominating petitions allegedly circulated by three individuals, Scott Bishop, Sr., Scott Bishop, Jr., and Crystal Bishop. The Board's disallowance of these signatures left Mayor Williams considerably below the 2000 signatures required for ballot access. *See* D.C.Code § 1–1001.08(i)(1)(B) (2002). The Mayor contends that the Board failed to "engage in the signature-by-signature review that would be necessary to sustain any challenge" to the signatures he offered (Br. for Pet. at 15), instead eliminating an entire class of signatures based upon suppositions of fraud and forgery in the circulation process, especially by the Bishops.

We conclude that there is ample factual and legal support for the Board's decision to disregard all of the signatures attributable to the Bishop petitions. The Board determined that there had been "widespread obstruction and pollution of the nominating process as it pertains to nominating petition sheets circulated by the Bishops." In support of this conclusion, it explained that the Mayor had not even attempted to defend 214 of the 512 petition pages submitted in his petition, with 167 (or 78%) of the 214 attributable to

Vincent Mark J. Policy, with whom Douglas J. Patton, Paul J. Kiernan, and Damien G. Stewart were on the brief, Washington, DC, for petitioner.

Kenneth J. McGhie, with whom Terri D. Stroud and Rudolph McGann were on the brief, for respondent.

Ronald L. Drake, Washington, DC, for intervenors.

Before FARRELL, REID, and WASHINGTON, Associate Judges.

<hr>

1. The Board was established by the District of Columbia Charter as an independent agency. *See* District of Columbia Self–Government and Governmental Reorganization Act, § 491, Pub.L. No. 93–198, 87 Stat. 774, 809 (1973) (codified at D.C.Code § 1–1001.03). The Board has both regulatory and investigative powers over the conduct of elections in the District of Columbia. *See* D.C.Code § 1–1001.05.

the Bishops. Among that total of approximately 4,240 signatures, the Board found that many had been forged (the questionable pages, the Board said, were "replete with forgeries"), and the Board additionally had grave concerns about the veracity of circulator affidavits signed by the Bishops that accompanied their petitions.[2] Those concerns were not allayed, moreover, when each of the Bishops, subpoenaed to answer questions about his or her role in the petition process, categorically refused to answer questions by asserting their Fifth Amendment privilege. The Board thus was unable, in its words, "to ascertain whether the [Bishop] circulators personally circulated petitions, or personally witnessed each person actually sign the petition," all as required by the election statute. Although the Registrar of Voters' "preliminary review" of the petition sheets submitted by the Mayor had yielded a total of 2,235 presumptively valid signatures, she likewise was unable to determine the veracity of the affidavits related to the Bishop petitions. Accordingly, the Board still was unable to determine "whether any of the signatures on the petition sheets from the Bishops were in fact genuine and properly obtained without undue influence or fraud." [3]

■ This court "must accept the Board's findings of fact so long as they are supported by substantial evidence on the record as a whole." *Allen v. District of Columbia Bd. of Elections & Ethics,* 663 A.2d 489, 495 (D.C.1995). "Insofar as the Board's legal conclusions are concerned, we must defer to its interpretation of the statute which it administers ... so long as that interpretation is not plainly wrong or inconsistent with the legislative purpose." *Id.* In the circumstances of this case, where the Board found, with the support of substantial evidence in the record, that the integrity of the nominating process has been seriously compromised by the actions of the Bishop circulators, we hold that it was within the Board's authority to disallow all of the signatures affected by the wrongdoing. As the Board recognized, the circulator's role in gathering signatures for a nominating petition is critical to ensuring the integrity of the collection process. In the case of candidate nomination for access to the ballot in a primary election, the circulator is responsible for collecting the

---

2. Even a cursory examination of petition sheets contained in the record reveals signatures casting doubt on the validity and accuracy of affidavits signed by the Mayor's circulators, especially Scott Bishop, Jr., and Crystal Bishop, swearing to the validity of those signatures. Among the purported signatures are those of actors, television (or cartoon) characters, politicians, and sports figures—including Robert De Niro, Wing Woo, Kelsey Grammer, Carroll O'Connor, Dudley Moore, Rosa Parks, George W., Tony Blair, Jack Kemp, Donald Rumsfeld, Kofi Annan, Martha Stewart, Stanley Marsh, George Allen, Brian Cox, Terre(a)nce Allen (listed twice), Ray Lewis, Joe Smith, and Reggie Lewis, to name just some. Also included are "Jahovas Witness" and "Saint Paul I." Moreover, countless petitions signed by Scott Bishop, Jr., and Crystal Bishop appear to list names of petitioners in the same handwriting and bear signatures apparently made by the same person. At times, no address appears after the petitioner's name, and occasionally the same name and address appear twice on the petition. One challenger alleged, without contradiction on the point, that Scott Bishop, Jr. had purportedly collected an improbable 540 signatures in one 24-hour period (*i.e.,* one approximately every two minutes), implying that he had either forged some of the signatures or not personally circulated the petition. Other petition pages signed by Scott Bishop, Sr., contained the non-existent date of June 31.

3. The Board took pains to note that "it [was] aware of no evidence that the Mayor personally encouraged or directed any circulators or other persons ... to fail to comply with the requirements set out by our laws and regulations."

genuine signatures of duly registered voters within the candidate's party. Indeed, with respect to nominating petitions, the circulator performs functionally the same role the Board itself fills in verifying signatures on an initiative or referendum petition. *See* D.C.Code § 1–1001.16(*o*)(3).

Accordingly, D.C.Code § 1–1001.08(b)(3) provides that each nominating petition

> shall contain an affidavit, made under penalty of perjury, in a form to be determined by the Board and signed by the circulator of that petition which shall state that the circulator is a registered voter and has:
>
> (A) Personally circulated the petition;
>
> (B) Personally witnessed each person sign the petition; and
>
> (C) Inquired from each signer whether he or she is a registered voter in the same party as the candidate. . . .

Underscoring the importance of this affidavit is D.C.Code § 1–1001.08(*o*)(1), which provides that, subject to the results of any challenge after posting of the petition, "[t]he Board is authorized to accept any nominating petition for a candidate . . . as bona fide with respect to the qualifications of the signatures thereto." A genuine and complete affidavit, then, undergirds the presumptive validity of voter signatures on a petition. Not surprisingly, therefore, a Board regulation declares that "[s]ignatures appearing on nominating petition sheets shall not be counted as valid unless all required information is provided by the circulator in his or her signed affidavit." 3 DCMR § 1600.6 (2002).

The upshot is that the presumption of validity of petition signatures depends heavily on the role of the circulator and on the truthfulness and completeness of the representations made in the circulator's affidavit. But in this case, as we have seen, the Board had firm grounds to doubt the veracity of the sworn representations by the Bishops as to the genuineness of the signatures they submitted, including— ultimately—their total refusal to be questioned about their conduct in the circulation process. The result, it may be said, was as if the affidavits had not furnished any of the information required by D.C.Code § 1–1001.08(b)(3), thus authorizing the Board to discount the accompanying signatures. 3 DCMR § 1600.6.

In circumstances similar to these, other courts have regularly concluded that nominating petitions tainted by fraud or the strong appearance of fraud may be discounted in their entirety by an elections board. In *Brousseau v. Fitzgerald,* 138 Ariz. 453, 675 P.2d 713 (1984), for example, the Supreme Court of Arizona enjoined the placing of a mayoral candidate's name on the ballot in light of evidence of fraudulent conduct by circulators, despite the fact that the county recorder had certified a minimally sufficient number of signatures as those of properly registered voters. The court reasoned:

> Defects either in circulation or signatures deal with matters of form and procedure, but the filing of a false affidavit by a circulator is a much more serious matter involving more than a technicality. The legislature has sought to protect the process by providing for some safeguards in the way nomination signatures are obtained and verified. Fraud in the certification destroys the safeguards unless there are strong sanctions for such conduct such as voiding of petitions with false certifications.

*Id.* at 715. After reviewing similar decisions from Ohio, Illinois, Pennsylvania, New York and New Jersey,[4] the Arizona

---

4. The court summarized these decisions as  follows:

court concluded that the only way to protect the integrity of the nominating process was to void petitions containing false certifications by circulators and bar any signatures on those petitions from being "considered in determining the sufficiency of the number of signatures to qualify for placement on the ballot." *Id.* at 716.

Petitioner appears to regard this body of law as irrelevant because the petition sheets that the Board found to be, among other things, "replete with forgeries" were *not* petitions the Mayor relied on to support his nomination. Thus, petitioner asserts that "there was no evidence that Scott Bishop, Sr., Scott Bishop, Jr., or Crystal Bishop forged any circulator affidavit on the petition sheets *that the Mayor was defending,* or that the petitions attributable to them *in the group that the Mayor was defending* had their names forged, or that they signed petition sheets which they had not circulated" (Reply Br. of Pet. at 10) (emphasis added). We reject the implication in this argument that the Bishops' conduct in its *entirety* was not relevant to the Board's deciding whether sworn assertions accompanying *any* of their petitions could be credited. As the

Board properly found, "[t]he Bishops' nominating petition sheets predominate Mr. Williams's nominating petition submission," and as to a sizeable number of the signature sheets the Bishops compiled overall, "[t]he attendant circumstances in the record controverted each material aspect of the [included] affidavit." Beyond this was the fact that "Scott Bishop, Sr. coordinated the petition process" generally. Thus, the obvious falsity of signatures in many of the Bishop petition sheets was properly considered by the Board in judging the veracity of all the affidavits they submitted. *Cf.* 2 J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979) ("The inference [properly drawn from fabrication of evidence] does not necessarily apply to any specific fact in the cause, *but operates, indefinitely though strongly, against the whole mass of alleged facts* constituting [a party's] cause.") (*quoted in Mills v. United States,* 599 A.2d 775, 783–84 (D.C.1991)).[5]

█ We similarly reject the Mayor's argument that, because the electoral statute specifies criminal misdemeanor penalties for willful misconduct by a petition circulator, impropriety by the Bishops can be dealt with only in that forum and could not

---

In *Weisberger v. Cohen,* 22 N.Y.S.2d 1011, 1012 (Sup.Ct.), *aff'd,* 260 App. Div. 392, 22 N.Y.S.2d 835 (1940), the New York court held that "[t]he surest way to keep [the petitions] free from fraud is to let it be known that any taint of fraud will wholly invalidate them...." *See also In Matter of Lombardi v. State Board of Elections,* 54 A.D.2d 532, 386 N.Y.S.2d 718 (3rd Dept., 1976) (court invalidates two entire sheets of signatures when they were "permeated with fraud"); *Lebowitz v. Barnes,* 32 Misc.2d 8, 221 N.Y.S.2d 703 (Sup.Ct.1961) (candidate should not derive any benefit from petition with fraudulent circulation verification committed by supporters). The New Jersey Superior Court, in *McCaskey v. Kirchoff,* 56 N.J.Super. 178, 152 A.2d 140 (1959), noting that a court should not sit as "a bookkeeper rather than a justice, to apply a rule of arithmetic rather than a princi-

ple of equity," (quoting Abrahams, *New York Election Law,* 123 (1950)) invalidated entire nomination petitions where those seeking nominations themselves irregularly certified petitions which included forged signatures. *Cf. Lawson v. Davis,* 116 N.J.Super. 487, 282 A.2d 784 (App.Div. 1971) (where verifications were made carelessly but not fraudulently there was no need to strike the petition when the election clerk independently checked the signatures).
675 P.2d at 715–16.

**5.** We do not consider the propriety of the Board's reliance on newspaper and other media articles that chronicled the irregularities in the petition circulating process, as that reliance was ultimately not prejudicial. *See* D.C.Code § 11–721(e) (2002).

be considered by the Board in deciding whether to accept individual signatures they had collected and which the Mayor was offering. *See* D.C.Code § 1–1001.08(b)(4). Evidence of fraud by circulators related directly to the Board's duty to resolve challenges to the nominating petition.

In sum, on the record before it the Board acted within its proper authority by disallowing all of the signatures attributable to the Bishops. Cases cited by the Mayor admonishing caution in remedying violations of electoral rules, lest the effect be to disenfranchise legitimate voters, are beside the point in a case such as this where the Board had substantial evidence in the record supporting its conclusion that the integrity of the nominating process had been undermined by forgeries and possible fraud.[6]

█ Petitioner's remaining contention is essentially a procedural one. He contends that he was surprised by the Board's decision which focused on misconduct by circulators, because "the sole basis announced for the Board's decision now was expressly *not* an issue at the hearing" (Reply Br. of Pet. at 1). Our review of the record, however, leads us to a contrary conclusion. Challenges filed by Mark Sibley and Shaun Snyder clearly implied that the petitions submitted by the Bishops contained

forgeries or, at best, were not personally circulated by them. Challenger Brizill also questioned the validity of the circulator affidavit of Mr. Bishop, Sr., by asserting that he did not live at the address listed for him on the Board's voter registration rolls. Both challenges asked the Board to throw out all of the petitions attributable to any of the Bishops. The Mayor was further put on notice that the allegations of circulator fraud would be part of the Board's consideration of the petition challenges at the Board's Pre Hearing Conference. Over objections by the Mayor's counsel, the Board's general counsel informed the parties that the Board was interested not only in the validity of the signatures on the petitions, but in the manner by which those signatures had been obtained, and that it was his belief that "the circulator issue is going to make or break what goes on [at the hearing]."

Even if we assume the Mayor's campaign was not on notice by the end of the pre-hearing conference that the issues before the Board included allegations of circulator fraud, the questions directed to the circulators who did appear at the hearing had to have put the Mayor on notice of the Board's concerns.[7] Moreover, campaign managers for the Mayor were questioned about the Bishops' activities in certifying

---

6. *See Dankman v. District of Columbia Bd. of Elections & Ethics,* 443 A.2d 507 (D.C.1981) (en banc); *Harvey v. District of Columbia Bd. of Elections & Ethics,* 581 A.2d 757 (D.C. 1990). *See also Buckley v. American Constitutional Law Found.,* 525 U.S. 182, 191 n. 10, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (invalidating provisions of state electoral law on First Amendment grounds but not questioning lower court's validation of affidavit requirement designed to "'ensure that circulators ... exercise special care to prevent mistake, fraud, or abuse in the process of obtaining ... signatures of only registered electors....'"). Judge Ferren's opinion in *Dankman,* cited by the Mayor at oral argument, was careful to

point out that the Board had rejected assertions of deceptive or misleading conduct by the circulators. *See* 443 A.2d at 519.

7. All of the circulators who testified at the formal hearing in this case were questioned about the validity of the signatures appearing on their affidavits, and both Ms. Lewis and Mr. Wilds testified under oath that several of the petition pages attributed to them were not signed by them. One of the circulators, Ms. Alston, testified that signers' names were added to her petition after she turned the sheets into the Williams campaign.

the validity of the nominating petitions. In light of these circumstances, we are unpersuaded by petitioner's argument that he was unaware that the Board was considering—and would resolve—allegations of fraud in the nominating process.

For the reasons stated, we affirm the order of the Board of Elections and Ethics under review.

*So ordered.*