CITIZENS COMMITTEE FOR the
D.C. VIDEO LOTTERY TERMI-
NAL INITIATIVE, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF ELECTIONS AND ETHICS,
Respondent.

Ronald L. DRAKE, et al., Intervenors.

No. 04–AA–957.

District of Columbia Court of Appeals.

Argued Sept. 8, 2004.

Decided Sept. 28, 2004.

George W. Jones, Jr., with whom Erik S. Jaffe, John Ray, Stephen L. Neal, Jr., and Elise Dang, Washington, DC, were on the brief, for petitioner.

Kenneth J. McGhie, with whom Terri D. Stroud and Rudolph M.D. McGann, Jr., were on the brief, for respondent.

Ronald L. Drake, pro se, filed a brief and argued as intervenor.

Dorothy Brizill and Carol Colbeth, pro se, filed a brief as intervenor.

Arthur B. Spitzer, Washington, DC, filed a brief amicus curiae on behalf of the American Civil Liberties Union of the National Capital Area.

Before FARRELL and RUIZ, Associate Judges, and NEWMAN, Senior Judge.

FARRELL, Associate Judge:

Petitioner, the Citizens Committee for the District of Columbia Video Lottery Terminal Initiative (the Citizens Committee), challenges a decision of the District of Columbia Board of Elections and Ethics (the Board) rejecting proposed Initiative Measure No. 68, entitled "The District of Columbia Video Lottery Terminal Initiative of 2004," on the ground that irregularities in the petition circulation process so "polluted" the signature-gathering operation conducted by a subcontractor, Stars and Stripes, Inc. (Stars and Stripes), as to require invalidation of all petition sheets circulated and signatures gathered by the Stars and Stripes circulators. After exclusion of these signatures, the number of apparent verified signatures remaining was below the number of 17,599 signatures of voter registrants citywide necessary to place the measure on the election ballot.[1] The Board therefore declined to certify the

_____

1. Because of this fact, the Board did not conduct the final stage of the verification process using random samples to compare petition signatures with original voter signatures in its files.

initiative for submission to the electorate. For the reasons that follow, we affirm the decision of the Board.

## I.

The Board rejected the petition sheets and signatures attributable to the Stars and Stripes operation[2] after a lengthy evidentiary hearing and after finding essentially two classes of wrongdoing by Stars and Stripes circulators headquartered at the Red Roof Inn, a hotel located at 500 H Street, N.W. The first, so-called "false signing" irregularities, concerned the affidavit requirement of D.C.Code § 1–1001.16(h) (2001), which requires an initiative petition circulator to certify under penalty of perjury that, among other things, he or she is a District of Columbia resident who "was in the presence of each person [signing a petition sheet] when the appended signature was written," and that "according to the best information available to the circulator, each signature is the genuine signature of the person it purports to be." *Id.* § 1–1001.16(h)(3) & (4).[3] The second class of irregularities, which the Board called "false advertising," concerned the regulation of the Board, 3 DCMR § 1003.6, that requires a circulator to swear that he or she "has not made any false statements regarding the initiative ... to anyone whose signature is appended to the petition." The Board found that language on a T-shirt worn by circulators ("Sign Up! For Jobs, Education & Health-

care") and oral communications to the same effect by circulators "were designed to induce potential signers to sign the petition based on the representation that the initiative would produce benefits for [District of Columbia] schools and healthcare." But because "Initiative Measure No. 68 did not—and could not—make any such promise or guarantee," the Board found that the representations made to potential signers both orally and via the T-shirts "constituted misrepresentations of Initiative Measure No. 68, and were therefore in violation of the attestation in the circulators affidavit that prohibits the making of false statements regarding the Initiative."

This court initially remanded the record to the Board for clarification of its ruling in light of significant First Amendment concerns raised by the Citizens Committee (as well as the ACLU as amicus) regarding the Board's exclusion of signatures based on "false advertising." We asked the Board to clarify (1) whether or not it intended its decision invalidating the Stars and Stripes petitions to rest independently on either class of improprieties found, in particular on the "false signings," and (2) if so, why. We further stated that "assuming the Board answers the first question affirmatively, it may wish to offer additional explanation of why it believes exclusion of signatures gathered by Stars and Stripes circulators, or sub-classes of such circulators, in addition to those who testi-

---

**2.** At the same time, the Board accepted all signatures gathered by circulators associated with a separate operation conducted by the Citizens Committee from offices of the law firm of Manatt, Phelps and Phillips, LLP, as well as those gathered by circulators whom the Board classified as "unaffiliated" because it could not directly link them to either operation. *See* discussion in part II.B., *infra.*

**3.** As the Board recognized, these requirements effectuate "the State's need to ensure

that circulators, who possess various degrees of interest in a particular initiative, exercise special care to prevent mistake, fraud, or abuse in the process of obtaining thousands of signatures of only registered electors throughout the [jurisdiction.]" *Buckley v. American Constitutional Law Found., Inc.,* 525 U.S. 182, 191 n. 10, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (additional quotation marks and citations omitted).

fied or were named in testimony before the Board, is warranted."

Following the remand, the Board issued a lengthy memorandum opinion that stated in conclusion:

> The Board's finding regarding "false signings" is separate from its "false advertisement" finding and provides an independent basis on which the Board intends its decision to rest. Because of the pervasiveness of the irregularities associated with the "false signings" and the accompanying pollution of the process that those irregularities fostered, the Board's decision invalidating the Stars and Stripes petition sheets rests independently on the finding regarding "false signings."

The Board reaffirmed and further explained its conclusion that "there was a systemic pattern of wrongdoing that permeated the Red Roof Inn operation," a "pervasive pattern of fraud, forgeries and other improprieties" that necessitated exclusion not just of petition sheets circulated by individuals implicated in wrongdoing by name at the hearing, but of all those circulated by the Stars and Stripes operation.

## II.

We affirm the Board's thoroughly documented and carefully explained decision, substantially for the reasons stated in its supplemental opinion attached hereto.

## A.

The Board's manifold findings of circulator impropriety, which are supported by substantial evidence in the record as a whole, *Pendleton v. District of Columbia*

*Bd. of Elections & Ethics,* 449 A.2d 301, 307 (D.C.1982),[4] include the following:

— Of the seventy-nine Stars and Stripes circulators the Board was able to identify from documents provided by the Citizens Committee, twelve appeared at the hearing in response to subpoena by the Board. Eight of these testified to having falsely signed circulator affidavits, and two refused to testify on grounds of self-incrimination. Those who testified identified three other circulators by name who had engaged in similar false signings. The Citizens Committee, by contrast, called no Stars and Stripes circulators to testify.

— Besides implicating themselves and naming other wrongdoers, the witnesses "implicated ... a much larger group of unnamed wrongdoers." In particular, Mike Jones, a "mid-level/supervisory affiliate of the Stars and Stripes organization," had engaged in the "well-known common practice" of having D.C. residents sign the affidavits of non-resident circulators. ("The out-of-towners," as one resident witness testified, would "go out all day and get signatures; but they didn't have [any-]body to sign it. And so I made a couple of extra dollars by just signing ... their papers.") Other non-resident circulators likewise claimed not "to worry about D.C. residents being there [to witness petition signatures] ... [T]hey had D.C. residents all lined up to sign off on the signature[ petitions] after they turned them in."

— Regarding some fifty-four petition sheets, the documents themselves showed that the signatures or printed names on the circulator affidavits had been crossed out and another signature or name substituted. "Indeed, the names of twenty-three different circulators appear as the replace-

---

4. "On appeal we do not review the record of an administrative proceeding de novo but, rather, examine the record to determine whether the agency could reasonably have found the facts as it did." *Pendleton,* 449 A.2d at 307.

ments for the crossed-out signatures or names on the altered petition sheets."[5]

— Witnesses testified to forgery of their signatures on affidavits. One witness said that of the twenty petition sheets attributed to him, he circulated only two; and another said he had circulated none of the forty petition sheets attributed to him. In addition, the Board "gave some credence" to reports of a "signing party" at the Red Roof Inn where names and addresses were allegedly copied from the telephone books onto petition sheets.

— Eight circulators who could not be subpoenaed had listed addresses on the affidavits that were non-existent or related to premises that were abandoned.

On the basis of this evidence, the Board found "a pervasive pattern of fraud, forgeries, and other improprieties that permeated the petition circulation process" operated by Stars and Stripes, in that witnesses had testified "not to individual acts of wrongdoing in an otherwise lawfully functioning system, but to an operation in which false signings were an established practice." In determining the proper remedy for this practice, the Board also considered the failure of the Citizens Committee to produce contrary evidence:[6]

> The Citizens Committee provided *no evidence* which contradicted the individual acts of wrongdoing to which the witnesses testified. It provided *no evidence* to rebut the established practice of "false signings" in which Mike Jones was identified as playing a key role .... It provided *no evidence* to rebut the physical evidence presented by the al-

tered circulator affidavits—indeed, it conceded the vast majority of those challenged sheets. And ... it made no apparent effort to produce witnesses who could not be located through the Board's subpoena process. [Emphases in original.]

Given the unrebutted "evidence of pervasive 'false signing' irregularities," the Board concluded that "the taint on the entire Stars and Stripes process requires the rejection of all signatures associated therewith." Because there was substantial unrebutted "evidence of wrongdoing which goes beyond named individuals to the [Stars and Stripes] operation as a whole," invalidation of the entire fruits of that operation was necessary, it concluded, "[i]f the integrity of the electoral process is to be maintained."

### B.

Just as we uphold the Board's findings of fact as supported by substantial evidence, we hold too that its conclusions of law flow rationally from those findings and comport with the applicable law. *See generally, e.g., Cathedral Park Condo. Committee v. District of Columbia Zoning Comm'n,* 743 A.2d 1231, 1239 (D.C.2000). The Board's conclusion that the pervasiveness of the wrongdoing associated with Stars and Stripes required exclusion of all petitions circulated by that operation is a mixed one of law and fact. It is factual, and thus requires substantial deference by this court, to the extent that it rests on the determination that the improprieties shown by the evidence point to "systemic" wrongdoing, *i.e.,* an established pattern of

---

**5.** The number of such alterations was sizeable enough that the Board was not required to accept the benign explanation now offered by the Citizens Committee that non-resident "circulator-assistants" who were working in pairs with residents might have mistakenly signed sheets and then "corrected that mistake" soon afterwards.

**6.** The Board noted that, although petition drive managers had testified on Citizens Committee's behalf, they "appeared uninformed about what was going on in the field."

fraud, forgery, and disregard of the statutory "in the presence" requirement by circulators and condoned by supervisors such as Mike Jones. It is more legal in nature to the extent that it presents the question whether the Board properly drew inferences adverse to the Citizens Committee from the Committee's failure to produce any Stars and Stripes circulators to contradict the evidence of wrongdoing presented. In the circumstances of this case, the Board's use of what amounts to a missing witness inference to extrapolate from the evidence it heard to a broader conclusion about the integrity of the Stars and Stripes operation was proper. As the Board pointed out, fully 83% of the Stars and Stripes circulators who responded to its subpoena gave testimony about false signings. Others were properly served with a subpoena but failed to appear, and the Board was unable to serve a still larger number. These circulators, because they had been employed by the Citizens Committee (and in many instances had been paid by it), were peculiarly within its control or ability to present as witnesses, and could be expected to shed significant light on the issues before the Board. Yet the Committee did not present a single one of them as a witness. In such circumstances, the law permits a trier of fact to draw unfavorable inferences about testimony against the party best equipped to call the witness but who fails to do so. *See, e.g., McPherson–Corder v. Chinkhota,* 835 A.2d 1081, 1085–86 (D.C.2003); *Strong v. United States,* 665 A.2d 194, 197 (D.C. 1995); *Lawson v. United States,* 514 A.2d 787, 789 (D.C.1986).[7] The Board's conclusion, drawn partly—but only partly—from this absence of rebuttal evidence, that the

wrongdoing shown by the evidence extended well into the ranks and hierarchy of the Stars and Stripes operation is supported factually and legally.

The Citizens Committee's response to this conclusion is basically twofold. First, the witnesses who testified and admitted wrongdoing were not "a random sample of circulators," it says; rather they were a small sub-group who "had a variety of connections to each other that make them more likely to have acted in concert with each other, but which distinguish them from the remainder of the Stars and Stripes circulators." The Board was not required to accept this improbable notion that those who alone had behaved wrongly were also those more "likely to appear together" under oath and admit wrongdoing. Similarly, the Committee asserts that it would have been "pointless" for it to attempt to "rebut[ ] the testimony of individuals who confessed to their own wrongdoing." But while it indeed might have been fruitless to attempt to rehabilitate these witnesses in particular, the Board found that their testimony demonstrated a *pattern and practice* of wrongdoing by Stars and Stripes circulators, and the absence of any contrary testimony showing the proper day-to-day conduct of the operation—by persons "[ ]informed about what was going on in the field"—was something that the Board could properly take into account.

We likewise uphold as reasonable the Board's determination that striking all of the petition sheets generated by Stars and Stripes was necessary to preserve the integrity of the ballot process. D.C.Code § 1001.16(k)(1)(D) permits the Board to

---

7. "The existence of an employment relationship between a party and a witness has generally been considered a significant factor indicating that the witness is more 'available' or within the 'control' of the party for purposes of the missing witness rule." Alan Stephens, Annotation, *Adverse Presumption or Inference Based on Party's Failure to Produce or Examine Witness With Employment Relationship to Party,* 80 A.L.R.4th 405, 416 (1990).

reject an initiative or referendum petition if "[t]he petition sheets do not have attached to them the statements of the circulators as provided in subsection (h) of this section." Subsection (h), as explained at the beginning, sets forth the important affidavit requirements to be met by a petition circulator, including an assertion under penalty of perjury that the circulator was in the presence of each person who signed a petition sheet. In cases of proven false signing of affidavits, the Board thus has undeniable authority to strike whole petition sheets associated with that impropriety. We likewise believe that, in a case such as this where the Board has justifiably found that wrongdoing permeated a signature-gathering operation, it may adopt the remedy of excluding all petitions associated with that operation—here Stars and Stripes. That remedy does not "disenfranchise legitimate voters," as the Citizens Committee argues, but rather upholds "the integrity of [an initiative] process" that has been "undermined by forgeries and ... fraud." *Williams v. District of Columbia Bd. of Elections & Ethics*, 804 A.2d 316, 321 (D.C.2002).

In *Williams*, a nominating petition case, we held that the Board "acted within its proper authority by disallowing all of the [voter] signatures attributable to" a family of circulators, the Bishops, who the Board found had engaged in widespread pollution of the petition-circulating process. *Id.* at 321 (emphasis added). The Citizens Committee argues that *Williams* may support exclusion of a subset (not clearly defined) of the Stars and Stripes petitions but not the entire class; the Board there did not imply, it says, that the petition sheets from other circulators who had not participated in the Bishops' wrongdoing could properly be rejected. In fact, of course, neither the Board nor the court in *Williams* had occasion to reach that issue of extrapolation

because exclusion of the Bishop petition sheets alone brought the number of valid ones below what the law required for the candidate to appear on the ballot. *Id.* at 317. *Williams* nevertheless endorsed the principle that the filing of a false affidavit by a petition circulator is much " 'more than a technicality' " and instead " 'destroys the safeguards [by which nomination signatures are obtained and verified] *unless there are strong sanctions for such conduct* such as voiding of petitions with false certifications.' " *Id.* at 319 (emphasis added) (quoting *Brousseau v. Fitzgerald*, 138 Ariz. 453, 675 P.2d 713, 715 (1984)). In the present case, the Board found the relevant analogue to the Bishop circulators in *Williams* to be the Stars and Stripes operation, stained as it was by "a pervasive pattern of fraud, forgeries and other improprieties that permeated the petition circulation process." Given that finding, exclusion of all of the Stars and Stripes petitions was a proper remedy.

It is worth pointing out, moreover, that even a remedy well short of excluding all of the Stars and Stripes signatures would have placed the Citizens Committee's effort to gain ballot access in grave jeopardy. In briefs and at oral argument, the parties agreed that after the Board's initial check of petition signatures against the voter registration lists, and after withdrawal of a large number of petition sheets by the Citizens Committee, some 21,664 signatures remained in support of the initiative, a number subsequently reduced to 21,279 by challenges technical in nature. Only at that point did the Board take up the substantive allegations about the petitioning process that gave rise to the evidentiary hearing and the ultimate findings of serious wrongdoing we have described. As Attachment A to the Board's supplemental opinion reveals, approximately 19,-506 apparently valid signatures remained after the Board struck the petition sheets of the eight Stars and Stripes circulators

who testified and admitted to false signings, the two who appeared at the hearing but refused to testify, and the three named by the testimony as additional false signers. Attachment A sets forth three additional categories of Stars and Stripes circulators whose petition sheets, if excluded, further reduced the number of remaining signatures to 18,093—less than five hundred above the citywide required minimum of 17,599. These were circulators who (1) had submitted false declarations of address of residence, (2) had participated in alteration of affidavits, or (3) had been properly served with Board subpoenas but failed to appear in the face of allegations of wrongdoing on their part. Regarding each of these categories, the Board was within its right to exclude—as it did—all signatures attributed to those circulators. But further, in Attachment B the Board named fifteen more circulators described as "unaffiliated" who evidence showed had taken part in similar acts of affidavit alteration and false declarations of address. If excluded, the signatures attributed to these circulators would have reduced the remaining signatures before the Board by almost another thousand, well below the statutory minimum. The Board did not strike these signatures only because it could not link the circulators to Stars and Stripes, although it made clear (in footnote 25 of the supplemental opinion) its belief that blame for the inability to establish their affiliation lay with the Citizens Committee.

The point of this discussion is not to furnish an alternative rationale for the agency's decision: the Board struck all of the Stars and Stripes petition sheets, and no others.[8] What the numbers do signify, however, is that unless the Board was obliged to choose the *narrowest* feasible remedy for the wrongdoing it found—*i.e.*, excluding only the petition sheets of specifically named circulators for Stars and Stripes—then the remaining signatures after any remedy it imposed were almost certain to fall short. For the reasons discussed, the Board acted within its authority in concluding that a broad remedy of exclusion—commensurate with the magnitude of the wrongdoing it had found—was necessary to preserve the integrity of the circulation process.[9]

*Affirmed.*

### APPENDIX

### DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS

Ronald Drake, D.C. Against Slots, and D.C., Watch,

Challengers,

v.

Citizens Committee for the D.C. Video Lottery Terminal Initiative of 2004,

Proponents.

Administrative Hearing No. 04-020

Re: Challenge to Initiative Measure No. 68

### CLARIFICATION MEMORANDUM OPINION

In an oral ruling of the District of Columbia Board of Elections' and Ethics ("the Board") rendered on August 3, 2004, as memorialized in a written Memorandum

8. Nor does our affirmance depend on the complete accuracy of the Board's counting, which has been challenged in various respects by the Citizens Committee, for example, as including instances of double-counting.

9. This conclusion would not be altered in the least by consideration of "declarations" of counsel to the Citizens Committee and an individual non-resident circulator-assistant that are attached to the Committee's latest submission in this court. Those declarations are not, moreover, part of the agency record and are not properly before us.

Opinion and Order issued on August 13, 2004, the Board concluded that the petition circulation process for the "Video Lottery Terminal Initiative of 2004" ("Initiative Measure No. 68") was so polluted by irregularities and improprieties as to warrant the rejection of signatures collected by Stars and Stripes, Inc., the primary petition drive subcontractor operating out of the Red Roof Inn hotel. Following an appeal to the District of Columbia Court of Appeals, the Court, by Order entered on September 13, 2004, remanded the record to the Board for a clarification of the Board's Opinion. Specifically, the Board was directed to address the question whether the Board's finding regarding "false signings" is an independent basis— separate from its "false advertising" finding—upon which the Board intends its decision to invalidate the Stars and Stripes petition sheets to rest, and if so, the reasons why. (*See* Order at 5.)[1] The Board was also invited to offer any additional explanation for the "exclusion of signatures gathered by particular Stars and Stripes circulators or sub-classes of such circulators in addition to those who testified or were named in testimony before

the Board." (*Id.*) This Clarification Memorandum Opinion constitutes the Board's response to the Court's inquiries.

The Board's finding regarding "false signings" is separate from its "false advertisement" finding and provides an independent basis on which the Board intends its decision to rest. Because of the pervasiveness of the irregularities associated with the "false signings" and the accompanying pollution of the process that those irregularities fostered, the Board's decision invalidating the Stars and Stripes petition sheets rests independently on the finding regarding "false signings." The reasons, together with explanatory information regarding the justification for excluding Stars and Stripes circulators, are discussed below.

## The Independent Nature of the "False Signings" Finding

The Board attempted to subpoena 102 circulators, fifty-three of whom could not be served and sixteen of whom ultimately appeared before the Board.[2] Of the sixteen subpoenaed circulator witnesses who appeared, twelve were from the Red Roof Inn operation.[3] Of the twelve witnesses,

1. As defined by the Court, "false signings" include the Board's findings as to violations of law associated with both the "in the presence" requirement for petition circulators, as well as forgeries of circulator signatures on petition affidavits and of signatories on petition sheets. (*See* Order at 2; BOEE Ex. 69 at 17–36).

2. During briefing before the Court of Appeals, the total number of circulators to be subpoenaed was erroneously stated as 103, instead of 102 as correctly stated in the Board's Memorandum Opinion. The list of 102 circulators was compiled based on witnesses requested by the Challengers and the Board. The Citizens Committee did not request that any witnesses be subpoenaed by the Board. Based on the addresses provided in the circulators'

affidavits, the Board attempted to serve subpoenas on the 102 circulators, with at least two attempts made to serve the majority of individuals who were not served in the first attempt or who failed to appear. (BOEE Ex. 6i at 108–116, 116–135).

3. The remaining four subpoenaed circulator witnesses (Janzell Coley, Augusteen Cowan, Vernon Humbles, and David Neverson) were from the Manatt, Phelps and Phillips operation, with which the Board did not take issue based on the evidence presented. (*See* BOEE Ex. 69 at 26, 49). The Citizens Committee voluntarily produced five additional circulator witnesses from the Manatt, Phelps and Phillips operation—Eugene Kinlow, Norman Neverson, Albrette Ransom, Bernice Rink, and Sheila Washington.

eight testified of false signings;[4] two witnesses asserted their Fifth Amendment right against self-incrimination and were not recalled;[5] and two witnesses were found by the Board to have essentially complied with the "in the presence" component of the circulator affidavit requirement.[6] Thus, ten of twelve—or 83%—of the circulator witnesses who responded to the Board's subpoena from the Red Roof Inn operation either testified about false signing irregularities in the petition circulation drive, or asserted their Fifth Amendment right against self-incrimination in connection with questions concerning the affidavit they had signed. All of these witnesses worked under the auspices of Stars and Stripes.[7]

The fact that such a high percentage of the subpoenaed circulator witnesses who appeared before the Board from the Red Roof Inn operation testified to false signing irregularities or chose not to testify raised serious concerns regarding whether the irregularities were isolated instances confined to these individuals, or were indicative of a pervasive pattern of wrongdoing as the Challengers had alleged. The testimony of these individuals and others, together with relevant documentary and other evidence, confirmed that the wrongdoing went beyond the witnesses who testified and the three other individuals implicated by name in their testimony.

First, the Red Roof Inn circulator witnesses, whose testimony the Board credited, implicated not only the three specifically named individuals, but a much larger group of unnamed wrongdoers—thus forming the basis for the conclusion that the wrongdoing was not isolated, but systemic. For example, Tenisha Colbert stated that she had suggested to Mike Jones, a Stars and Stripes affiliate, that she sign someone else's petition sheets because it was, in reality, a common practice. In this regard, she stated: "So, the D.C. residents were signing on the out-of-towners and they was getting other people to sign theirs. So, I figured it was okay, since everybody else was doing it." (BOEE Ex. 69 at 29, n. 28; BOEE Ex. 6h at 27–28). Ms. Colbert further described the nature of this practice that she personally observed:

> In Mike [Jones'] room, it was always a lot of people, a lot of commotion in his room. Some people would come in and say they didn't (sic) enough signatures or some people didn't have a witness,

---

4. Six of these eight witnesses initially asserted their Fifth Amendment right against self-incrimination, were subsequently granted immunity and were recalled to testify (Danielle Campbell, Tenisha Colbert, Melissa Darnell, Evelyn Gerst, Antoine Jeffries and Andre Rempson). (*See* BOEE Ex. 69 at 28–31). The remaining two witnesses did not assert the Fifth Amendment (Stephen Atkins and Forest Jackson). (*Id.* at 34–35).

5. These two witnesses were Gwendolyn D. Squirewell and Tanica Hunter. (*See* BOEE Ex. 69 at 33–34).

6. These two witnesses were Bobbie Diggs and Margol Inabinet. (*See* BOEE Ex. 69 at 29, n. 28).

7. Four non-residents with whom these witnesses worked and at whose direction the wrongdoing was committed (Curtis Fuentes, Ray Kingsford, Mike Jones and Darryl Bonner) also were affiliated with Stars and Stripes. (BOEE Ex. 6f at 209–216, 275, 297, 393, 397–400; BOEE Ex. 6h at 28, 32). Therence James, Sr. ("T.J."), another non-resident implicated in the wrongdoing apparently was affiliated with another one of the petition drive subcontractors (BOEE Ex. 6f at 303, 308, 310, 323, 344, 351, 365), while a man known as Brian accompanied T.J. (Id. at 355–356).

most of the out of towners. They would say they didn't have enough signatures or they didn't have a witness and they would come and ask Mike do you know a D.C. resident that can sign off my papers, because I didn't have a witness today. And he would find somebody, find a D.C. resident and get them to sign off on their papers.

(BOEE Ex. 6h at 31).

The practice of non-residents circulating petition sheets unaccompanied by a D.C. resident and then appearing at the Red Roof Inn at the end of the day to have their petition sheets witnessed by any D.C. resident who happened to be available was also reflected in the personal experience to which Antoine Jeffries testified. Mr. Jeffries, a D.C. resident who had no previous involvement in the petition circulation drive, but was simply present in the hotel room of Mike Jones when petition sheets were being turned in, stated that he was drafted to sign the sheets of two non-residents who had no D.C. resident witness to sign their petition sheets. (BOEE Ex. 6h at 58–63). Danielle Campbell testified about similar experiences:

Some days like at the end of the day, like at the Red Roof Inn, people didn't have witnesses. The out-of-towners, they will go out all day and get signatures; but they didn't have nobody to sign it. And so I made a couple of extra dollars by just them, signing their papers.... And that's probably how I got

all these [petition sheets attributed to me]. Because I don't remember doing all these papers.

(BOEE Ex. 6f at 304, 312–315). Andre Rempson also testified that he participated in this brand of false signing activity without even knowing whose petition sheets he was signing:

Q: So you never signed any petition sheets that Mike Jones collected?

A: I had signed some when we got to the hotel. But I don't know if those are the ones he collected. But I had signed some.

Q: So at some point you signed petition sheets at the hotel?

A: Yes.

Q: And this was petition sheets for whom?

A: I don't know. He just passed me the petitions and he told me to sign them.

Q: And this was Mike Jones?

A: Yes.

(BOEE Ex. 6f at 405–406).[8]

Other non-residents appeared to plan ahead in securing an "after-the-fact" D.C. resident witness. As reflected in the complaint of Angela Rooney, who wrote to the Board about her encounter with non-residents who were circulating petition sheets:

The two circulators from Seattle said they didn't have to worry about D.C. residents being there. That they had D.C. residents all lined up to sign off on

8. Mr. Rempson continued:

A: At the hotel room, he kept on—and he would say, "Here, sign there. Here, sign there. Here, sign there." And I did it.
Q: And "He" was who? Mike Jones?
A: Mike Jones.

* * *

A: He told me, he was inside the hotel room, and people, I guess they came from another room, they brought them in. And I

know the—and after I finished signing them, I know he just kept passing more and more petitions. He kept just passing more and more.
Q: And he is whom?
A: Mike Jones. Mike Jones just kept passing more and more. Each time he passed it said, "here, sign these"—then he said, "Sign these, sign these, sign these."

(BOEE Ex. 6f at 414, 415–416).

the signatures after they turned them in.

(Board Ex. 26 (Angela Rooney Complaint)). Complaints were also submitted by other individuals who encountered non-residents on the streets of the District of Columbia circulating petition sheets without a D.C. resident present or in close proximity. Board Exs. 1, 3; BOEE Ex. 69 at 32 (John Capozzi Complaints) Board Ex. 26 (J. Marcus Meeks and Norman L. Brown Complaints).

The evidence thus showed that this fraudulent practice, which yielded false affidavits that compromised the integrity of the petition circulation process, was not an isolated occurrence. To the contrary, the testimony of the individual witnesses, as well as other evidence, revealed that this was a well-known, common practice engaged in by non-residents, assisted by D.C. residents, and accomplished with the knowledge, direction, and active participation of at least one mid-level/supervisory affiliate of the Stars and Stripes organization to whom petition sheets were turned in.[9] The seemingly common nature of this practice apparently was not lost on members of the Citizens Committee, who met to discuss "rumors of possibly non-D.C. residents petitioning" and responded with the drafting of a memorandum to "all petitioners." (Challengers' Ex. 16; BOEE Ex. 6c at 319–320; 426).[10]

Second, in addition to the foregoing, there was also other evidence which suggested that false signings extended beyond mere isolated occurrences. Among the many allegations of irregularities and improprieties asserted by the Challengers— all of which are properly considered in assessing the totality of the circumstances—there was one alleging that circulator affidavits had been altered. Fifty-four petition sheets were challenged on this basis, forty of which were conceded by the Citizens Committee. (BOEE Ex. 69 at 21 and nn. 16, 17). The challenges to twelve of the remaining fourteen sheets were upheld by the Board. (BOEE 69 at 21 and n. 18).

The fact that most of these challenged petition sheets were conceded does not obviate the underlying problem that a physical inspection of these sheets discloses. The altered sheets reveal that the signatures or printed names on the circulator affidavits were crossed out and another signature or name substituted.[11] On seven of the sheets where the original signature can be discerned, Ray Kingsford's name appears. This non-resident was the same Stars and Stripes affiliate whose petition sheets Danielle Campbell testified to having signed, notwithstanding that he had circulated the sheets outside of her presence. See BOEE Ex. 69 at 29. The Ray Kingsford example strongly suggests that some circulator affidavits were being altered in an attempt to conceal—through false affidavits—that non-residents were unlawfully circulating petition sheets. These altered petition sheets provide physical evidence of the "false signing" irregularities about which there was testimony.

9. Ross Williams identified Mike Jones as a non-resident "assistant" who had petition sheets turned in to him and non-residents working under him. (See BOEE Ex. 6g at 238–239).

10. As noted in the Board's August 13, 2004 Memorandum Opinion and Order, notwithstanding the importance of this issue, the distribution of the Clint Hyatt memorandum remained a mystery. (BOEE Ex. 69 at 47).

11. Some of the original signatures were blackened out in such a way as to conceal the signature.

Also of significance with respect to the Ray Kingsford example is the fact that this time, it was not Danielle Campbell whose name appeared on his petition sheet, but that of Hope Williams—a different D.C. resident. Consistent with the testimony, it is apparent that non-residents who were recruiting D.C. residents to engage in the "false signing" activity did not necessarily restrict themselves to a single D.C. resident. Indeed, the names of twenty-three different circulators appear as the replacements for the crossed-out signatures or names on the altered petition sheets.[12] Only three (Tenisha Colbert, Gwendolyn Squirewell and Evelyn Gerst) overlapped with the individuals who appeared before the Board. This evidence further confirms that the false signing irregularities were not confined to those who appeared as witnesses at the Board proceeding.

It is this type and caliber of evidence that was presented to the Board in a virtually unbroken chain by the circulator witnesses from the Red Roof Inn operation during the course of the Board proceedings and that went to the "core" of the Challengers' allegations. (See BOEE Ex. 69 at 25). In addition to this evidence, there were forgeries—another brand of "false signings"—about which some of the witnesses testified.[13] There was also the evidence upon which the Board based its conclusion that the Red Roof Inn operation was "ripe for the types of improprieties and irregularities that occurred"; was "fraught with opportunities for abuse of the process, system and laws;" and "would encourage, on a systemic basis, the kinds of violations about which there was testimony." (BOEE Ex. 69 at 45, 50–51, 45–48 (excluding "false advertising" evidence)).[14]

12. The twenty-three individuals are: Vanessa Afolayan, Lewis Burney, Tenisha Colbert, Larry Fisher, Desi Gatling, James Hawkins, Tyrone Hodges, Robert Howard, Jessie Ryan Jones, James Knight, Michele Lee, Rommel McBride, Kenneth Moore, Thomas Robinson, Rickey Satterthwaite, Nicole Scott, Andre Smith, Gwendolyn Squirewell, Antoine Walker, Hewitt Williams, Hope Williams, Terrance Wilson, and Evelyn Gerst.

13. In addition to individual testimony concerning both circulator and signatory forgeries (Stephen Atkins, Forest Jackson, Andre Rempson, and Robert Price), there were reports of a "signing party" where names and addresses allegedly were being copied from telephone books to petition sheets. The Board gave some credence to this evidence, while acknowledging the insufficiency of the evidence for purposes of determining how widespread the conduct was. (BOEE Ex. 69 at 35–36).

14. The Citizens Committee presented documentary and testimonial evidence of Circulator Agreements, identification requirements for circulators, and witness declarations—the system as it was supposed to be. (BOEE Ex. 6c at 365–368; BOEE Ex. 6i at 152; BOEE Ex. 17; BOEE Ex. 18; BOEE Ex. 53). However, it was quite apparent from the testimony presented—even from petition drive managers themselves—that the manner in which the process was managed and actually operated facilitated the types of irregularities and improprieties that occurred. (BOEE Ex. 69 at 28, 45–48 (excluding "false advertising" evidence)). Similarly, the Committee went to great lengths during the Board proceedings to describe their "purging" and "quality assurance" processes (BOEE Ex. 6f at 105–111), which purportedly included the purging of invalid signatures—including of those who were not registered voters according to the Board's voter registration roll to which the Committee had access. (BOEE Ex. 6g at 19–20). Nonetheless, the evidence revealed that these processes were used to determine validity rates for purposes of paying the petition drive workers (BOEE Ex. 6c at 229–230, 349–350; BOEE Ex. 6f at 162–163), and not to promote the integrity of the electoral process. The fact that all 56,044 signatures were submitted to the Board notwithstanding the "purging" and "quality assurance" processes confirms this fact. (See BOEE Ex. 69 at 8).

Further, there was the fact that the Board was unable to locate, for purposes of serving subpoenas, fifty-three of the 102 potential circulator witnesses (over half), thus rendering these individuals unavailable to testify. Eight of these individuals—all of whom were the subject of allegations of wrongdoing by the Challengers—listed addresses that were either non-existent or premises that were abandoned. (*See* BOEE Ex. 69 at 47, n. 45).[15] When taken together, there was thus a wealth of evidence—independent of the "false advertising" finding—which supports the Board's conclusion that "serious violations of law that cast doubt on the validity of the signatures gathered permeated and polluted the petition drive operation conducted from the Red Roof Inn" (BOEE Ex. 69 at 51), and upon which that conclusion rests.

In striking contrast to the steady flow of adverse evidence that was presented to the Board concerning the Red Roof Inn operation, and further reinforcing the strength of that adverse evidence was the "deafening silence" from the Citizens Committee. *See* BOEE Ex. 69 at 48. Simply stated, the Citizens Committee produced nothing to rebut the adverse evidence regarding the Red Roof Inn operation, although it had full opportunity to do so. The Citizens Committee produced no evidence in response to the testimony of the individual witnesses—choosing not to even cross-examine some,[16] and failing to produce evidence even when the Board granted the Citizens Committee's request to be allowed time to submit rebuttal evidence.[17] Nor did the Citizens Committee produce any rebuttal to the evidence that there was a systemic pattern of wrongdoing that permeated the Red Roof Inn operation. (*See* BOEE Ex. 69 at 48–50).

The Citizens Committee was equally silent in response to the difficulty experienced by the Board in attempting to secure the appearance of D.C. resident circulator witnesses to testify before the Board. One would have expected that, having worked on the Citizens Committee's behalf as circulators during the petition drive, and given that circulators are the individuals charged with vouching for the integrity of the process, the Citizens Committee would have secured the appearance of at least *some* of these witnesses to present favorable evidence—if such existed—regarding the signature gathering process that was being challenged. However, not a single such witness from the Red Roof Inn was produced by the Citizens Committee.

Similarly, there were several non-resident affiliates of the petition circulation companies who were implicated in the wrongdoing—indeed, as the ones who were responsible for directing the "false signing" activities. Having worked on behalf of the Citizens Committee, one would have expected that the Citizens Committee would have secured their appearance and the appearance of other non-resident "as-

---

15. In the Board's Memorandum Opinion and subsequent briefing before this Court, it was stated that the number of individuals who provided false addresses was nine. (BOEE Ex. 69 at 47, n. 45; Rep. Br. at 27). The correct number, however, is eight, because the Board concluded that the address on the circulator affidavit for Mr. Steven Howell, which was not entirely legible, had been misread by those serving the subpoenas. (*See* BOEE Ex. 6i at 131, 142). This error does not affect the results because Mr. Howell was identified with the Manatt, Phelps and Phillips operation and not Stars and Stripes.

16. *See* BOEE Ex 6f at 215 (Gerst); BOEE Ex. 6c at 217 (Atkins).

17. *See* BOEE Ex. 6c at 161 (counsel requests the opportunity to "investigate [a witness'] situation a little more," but produces no contrary evidence).

sistants" to defend their actions and the conduct of the petition drive generally. Once again, however, no such witnesses were produced by the Citizens Committee.[18] Most notable in this regard was Mike Jones. Although Mr. Jones was identified as a principal player in alleged wrongdoing at the Red Roof Inn, and his photograph and subsequently his identity were disclosed from relatively early in the proceedings (BOEE Ex. 6e at 9–10), the Citizens Committee ultimately advised that, because he was employed on another job, he was unavailable to testify until August 3—the day on which the Board was statutorily required to render its ruling. (BOEE Ex 6i at 49–50, 136–142).[19] Accordingly, neither Mr. Jones, no[r] any of the other non-resident circulator or mid-level affiliates from the Red Roof Inn operation who were familiar with the details of the signature gathering process were produced by the Citizens Committee. In short, although counsel for the Citizens Committee asserted during his closing argument that the "incidents of fraud or forgery [were] not representative samples, but rather the working of individuals who acted for self in violation of the District laws and the committee's procedures," (BOEE Ex. 6i at 225) the Citizens Committee failed to present *any* evidence to support this assertion.

It is, of course, well settled that the Challengers bear the burden of persuasion as to the claims that they asserted. (*See* D.C. Mun. Regs. tit. 3 § 424.1 (1998).) Nonetheless, once the Challengers have satisfied their initial burden of production—as they did here—it is incumbent on the Proponents to come forward with rebuttal evidence, with the Challengers, of course, responsible for carrying their ultimate burden of proof. The Citizens Committee's utter and complete lack of evidence to counter the Challengers' claims of individual and pervasive wrongdoing in the Red Roof Inn operation rendered the evidence presented by the Challengers dispositive. (BOEE Ex. 69 at 48–50.)

Thus, the Board's conclusion that "serious violations of law that cast doubt on the validity of the signatures gathered permeated and polluted the petition drive operation conducted from the Red Roof Inn" (BOEE Ex. 69 at 51) is well supported by the Board's "false signings" finding—independent of its "false advertising" finding. The Board would, therefore, reach the same conclusion in the absence of the "false advertising" finding.

### Rationale for Exclusion of Signatures

Based on the evidence presented which indicated that most of the improprieties and irregularities that polluted the Red Roof Inn operation appeared to be associated with Stars and Stripes, the Board concluded that "the clear evidence of wrongdoing was most concentrated and

---

18. As noted previously by the Board, the testimony of the petition drive managers, who appeared uninformed about what was going on in the field, did not provide a viable substitute. (BOEE Ex. 69 at 49–50).

19. In order to be as accommodating as possible, consistent with the Board's statutorily mandated schedule, the Board indicated its willingness to allow Mr. Jones to testify on the morning of August 2—the day on which closing arguments were scheduled. (BOEE Ex 6h at 402). On that morning, the Committee advised of Mr. Jones' unavailability, and it proffered an affidavit from Mr. Jones instead. In response to the proffer of the affidavit, the Board ruled against admitting it into evidence on the ground that it—like written complaints that had been proffered by the Challengers and were excluded—could not be subject to cross-examination. *See Selk v. Dep't of Employment Services*, 497 A.2d 1056, 1059 (D.C. 1985); (BOEE Ex. 6i at 142; *see id.* at 107)

identifiable in the Stars and Stripes operation [.]" (BOEE Ex. 69 at 51), and thus focused on excluding only those petition sheets attributed to individuals who could be identified as working under the auspices of Stars and Stripes. Based on the documentation provided by the Citizens Committee, there are seventy-nine D.C. residents identified as working with Stars and Stripes.[20]

## The Pollution of the Petition Drive Process

All of the circulators identified as working with Stars and Stripes fall within the Challengers' allegation that there was a pervasive pattern of fraud, forgeries and other improprieties that permeated the petition circulation process, as well as within the Board's finding that such a pervasive pattern did, in fact, exist, which polluted the petition drive operation conducted by Stars and Stripes. The Board's finding in this regard warrants the exclusion of all signatures collected by Stars and Stripes circulators.

This is not a case of isolated instances of wrongdoing, but rather a petition drive process that was polluted with irregularities and improprieties.[21] The unrebutted evidence confirmed that fact. Indeed, the evidence showed that 83% of the subpoenaed circulators from the Red Roof Inn who came forward to testify—all of whom were from Stars and Stripes—testified to "false signings" in which they were involved or with which they were associated. Further, several of these witnesses testified not to individual acts of wrongdoing in an otherwise lawfully functioning system, but to an operation in which false signings were an established practice. This testimony was supported by written and oral complaints as well as by some of the petition sheets themselves. It was further supported by evidence that the petition drive was managed in such a manner and conducted in such a context as to facilitate and encourage precisely the types of irregularities and improprieties about which there was testimony. Given the evidence presented, the individuals who testified—far from representing isolated instances of wrongdoing—more likely represented examples of various ways in which the established pattern of "false signing" irregularities was manifested.[22]

20. The August 5, 2004 report of the Executive Director of the Board (BOEE Ex. 68) indicated that there were sixty-seven, instead of seventy-nine circulators associated with Stars and Stripes. Seventy-four were properly listed in the attachment. An additional five individuals associated with Stars and Stripes were incorrectly listed in the non-affiliated category. Those individuals were: Angelo Farrell, Randolph Green, Donnell Sweat, Sheila Washington, and Gerald Williams. Because these individuals were already included in the 21,279 count, the ultimate number of excluded signatures does not change.

21. This situation is thus distinguishable from the type of scenario to which 3 DCMR 1009.7 in that the pervasive nature of the irregularities calls for a "totality of the circumstances" type of analysis, rather than a signature by signature or circulator by circulator type of analysis, as was contemplated by the Board when it promulgated the regulation.

22. For example, the different manifestations presented to the Board included: the signing of blank petition sheets (Gerst); signing of a partner's sheet in spite of not having circulated with him (Campbell, Darnell); picking up any D.C. resident witness at the end of the day (Jeffries, Colbert, and Campbell); signing sheets presented for signature without any knowledge as to whom the sheets belonged (Rempson); signing sheets of a partner for whom there was no prior knowledge that the signer was serving as a witness for the partner (Colbert); forging the signatures of D.C. residents on the circulator affidavits (Atkins, Jackson), and taking names out of telephone books and forging them as signatories (Rempson).

This type and consistent pattern of adverse evidence requires a response. However, the Citizens Committee provided none. The Citizens Committee provided *no evidence* which contradicted the individual acts of wrongdoing to which the witnesses testified. It provided *no evidence* to rebut the established practice of "false signings" in which Mike Jones was identified as playing a key role. It provided *no evidence* that contradicted the accounts presented by those who filed oral and/or written complaints. It provided *no evidence* to rebut the physical evidence presented by the altered circulator affidavits—indeed, it conceded the vast majority of those challenged sheets. And finally, it made no apparent effort to produce witnesses who could not be located through the Board's subpoena process. As the Board found, there was a "deafening silence" in the face of the "indisputably troubling evidence of wrongdoing." (BOEE Ex. 69 at 48, 49). In the absence of rebuttal evidence which addresses the evidence of pervasive "false signing" irregularities, the taint on the entire Stars and Stripes process requires the rejection of all signatures associated therewith. (*See* Attachment A).[23]

**"Pollution Plus"**

Against the backdrop of this evidence of pervasive wrongdoing, there were subcategories of Stars and Stripes circulators who had other disqualifying factors.

*Circulators Who Submitted False Declarations Of Residence Addresses And Were Unavailable To Testify*

Some individuals attested in the circulator affidavit that they resided at a particular address that turned out to be a non-existent address or premises that were vacant or abandoned.[24] In addition to the general taint from the pollution of the system, these individuals executed false circulator affidavits, which by itself is sufficient to invalidate the signatures (*see Williams v. District of Columbia Board of Elections and Ethics*, 804 A.2d 316, 319 (D.C.App.2002) (citing *Brousseau v. Fitzgerald*, 138 Ariz. 453, 675 P.2d 713, 715 (1984), which provides that "the filing of a false affidavit by a circulator is a much more serious matter involving more than a technicality. The legislature has sought to protect the process by providing for some safeguards in the way nomination signatures are obtained and verified. Fraud in the certification destroys the safeguards unless there are strong sanctions for such conduct such as voiding of petitions with false certifications."); BOEE Ex. 69 at 13–16), and were also unavailable to testify because they could not be located, another ground for invalidating the signatures. *See Buckley v. American Constitutional Law Foundation Inc.*, 525 U.S. 182, 196, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). The lack of a valid address also casts doubt on whether the person is, in fact, a resident of the District of Columbia. (*See also* D.C.Code § 1–1001.16(h)(1)(circulator

---

**23.** The opportunity to advance a "pollution" case is particularly important in a large-scale operation such as the instant one where there is substantial evidence of wrongdoing which goes beyond named individuals to the operation as a whole. If the integrity of the electoral process is to be maintained, there must come a point at which the evidence is sufficient to place the burden of production on the proponent of the measure to respond with rebuttal evidence to avoid a finding that the entire process has been tainted by the wrongdoing. The Board believes that point was reached here.

**24.** Recognizing that a homeless person could be residing in an abandoned building, the burden of establishing that fact clearly would rest on the Citizens Committee, which submitted no such evidence.

affidavit must contain the residence address of the circulator); Attachment A at Section A.)

*Circulators Who Participated In Alteration Of Circulator Affidavits And Were Unavailable to Testify*

The signatures of some individuals appeared on circulator affidavits in which the signature or printed name of the original signer was crossed out and the individual's name was replaced. In addition to the general taint from the pollution of the system, this alteration raised questions as to the identity of the actual circulator and the likelihood, given other evidence presented, that the D.C. resident signer was executing a false affidavit on a petition sheet that was circulated by another individual, including a non-resident. The evidence of wrongdoing with respect to the altered affidavits casts doubt on the veracity of other petition sheets circulated by these individuals. In addition these individuals were unavailable to testify because they either failed to appear after being properly served, or could not be located. These various factors provide more than ample basis to invalidate the signatures on their petition sheets. (*See* Attachment A at Section B.)

*Circulators Who Were Subject To Allegations of Wrongdoing and Were Unavailable To Testify*

Some individuals were alleged to have engaged in wrongdoing involving forgeries, altered affidavits, etc., but were unavailable to testify because they either failed to appear after being properly served, or

could not be located. In a context, as here, where the Challengers have offered considerable probative and unrebutted evidence of wrongdoing by other individuals, together with evidence that such wrongdoing is systemic, the Citizens Committee cannot be allowed to stand on the challenged affidavit. The unavailability of the witness provides a justifiable basis, in this context, to invalidate the signatures. (See Attachment A at Section C.)

## Signatures Not Excluded

The testimony revealed that Stars and Stripes was the predominant subcontractor operating from the Red Roof Inn hotel. Nonetheless, only 79 circulators could be identified from the documents provided by the Citizens Committee as working under the auspices of Stars and Stripes. The affiliation for approximately 167 circulators could not be determined from the documentation provided;[25] thus, their petition sheets and accompanying signatures were not excluded.

The large number of circulators in the "unaffiliated" category, due to inadequacies in the documentation, is significant in that many of those individuals had the same disqualifying factors discussed above. Nonetheless, because they could not be linked through the documentation to Stars and Stripes, the Board did not exclude those signatures. (See Attachment B.)

The Board hereby submits this Clarification Memorandum Opinion in response to the District of Columbia Court of Appeals' Order entered on September 13, 2004, remanding the record to the Board

---

**25.** The documentation consisted of a large stack of batch sheets only, which are the cover sheets that would normally be appended to a group of petition sheets. Batch sheets indicate which individual circulated the petition, the identity of the supervisor, and the name of the petition circulation company.

The overwhelming majority of the batch sheets provided by the Citizens Committee had only the name of the non-resident circulator with no corresponding D.C. resident circulator. They, therefore, could not be matched with the petition sheet that bore the names of the D.C. resident circulators.

for a clarification of the Board's decision rendered on August 3, 2004, as memorialized in a written Memorandum Opinion and Order issued on August 13, 2004.

September 20, 2004

/S/ Wilma A. Lewis
Chairman, Board of Elections and Ethics
Dr. Lenora Cole
Member, Board of Elections and Ethics
Charles R. Lowrey, Jr.
Member, Board of Elections and Ethics

## ATTACHMENT A
### STARS AND STRIPES CIRCULATORS

### A. CIRCULATORS WHO SUBMITTED FALSE DECLARATIONS OF RESIDENCE ADDRESS

*Unable To Serve*

| | |
|---|---|
| Cynthia Allen * | 98 |
| Antoine Walker ** | 198 |

\* This individual is also subject to allegations of forgery.
\*\* This individual also participated in alteration of affidavits.

| | |
|---|---|
| Total Number of Verified Voters Stricken: | 296 |
| Total Number of Signatures Remaining: | 19,210 |

### B. CIRCULATORS WHO PARTICIPATED IN ALTERATION OF AFFIDAVITS

1) *Properly Served and Failed to Appear* 1

| | |
|---|---|
| Daryl Bowman | 294 |
| James Knight | 4 |
| Thomas Robinson | 112 |
| Andre Smith | 8 |

| | |
|---|---|
| Total Number of Verified Voters Stricken: | 418 |
| Total Number of Signatures Remaining: | 18,792 |

2) *Unable To Serve*

| | |
|---|---|
| Larry Fisher | 19 (No Apt. Number) |
| Tyrone Hodges | 13 (Unable to gain access into Bldg.) |
| Robert Howard * | 114 (Halfway House) |
| Antoine Walker ** | — (Abandoned Home) |

\* This individual is also subject to allegations of forgery.
\*\* This individual also submitted a false declaration of residence address.

| | |
|---|---|
| Total Number of Verified Voters Stricken: | 146 |
| Total Number of Signatures Remaining: | 18,646 |

### C. CIRCULATORS SUBJECT TO ALLEGATIONS OF WRONGDOING

1) *Properly Served and Failed to Appear*

| | Reason for Challenge | |
|---|---|---|
| Stephen Jones | Affidavit Forgeries | 288 |
| Annitta Riddick | Affidavit Forgeries | 10 |
| Rickey Satterthwaite * | Altered Affidavit | 76 |
| Randolph Green | Petition Forgeries | 111 |
| Sheila Washington | Affidavit Forgery | 40 |
| Gerald Williams | Affidavit Forgery | 28 |

\* This individual appeared, but left before being called to testify.

| | |
|---|---|
| Total Number of Verified Voters Stricken: | 553 |
| Total Number of Signatures Remaining: | 18,093 |

2) *Unable To Serve*

1. These individuals were among those for whom there was evidence of altered affidavits on other petition sheets, except for Daryl Bowman, a resident of a home for the mentally disabled, who was challenged based on his competency to circulate petitions.

*Reason for Challenge*

| | | | |
|---|---|---|---|
| Cynthia Allen * | Petition Forgeries | — | (Abandoned shelter) |
| Paul Belt | Affidavit Forgeries | 147 | (No longer lives there) |
| Patricia Boggs | Affidavit Forgeries | 113 | (No longer lives there) |
| Lionell Butler | Residency Questioned | 205 | (Church) |
| Doris Jean Clark | Affidavit Forgeries | 86 | (No Apt. Number) |
| Alan Clipper | Residency Questioned | 12 | (Vacant house) |
| Rose Daniels | Affidavit & Petition Forg. | 230 | (Unable to gain access ) |
| Alvina Edwards | Residency Questioned | 232 | (No access to building) |
| Thomas Green | Petition Forgeries | 103 | (Shelter) |
| Phillip Howard | Residency Questioned | 8 | (Unable to gain access) |
| Angela Jackson | Affidavit Forgeries | 165 | (Shelter) |
| Scott Smith | Affidavit Forg. | 56 | (Shelter) |
| Latawrang Jumhariyah | Altered Affidavit | 72 | (Shelter) |
| Donnell Sweat | Affidavit Forgery | 111 | (No Apt. Number) |

* This individual also submitted a false declaration of residence address.

**Total Number of Verified Voters Stricken:**     1,540
**Total Number Of Signatures Remaining:**     16,553

## D. CIRCULATORS SUBJECT TO GENERAL ALLEGATIONS OF PERVASIVE WRONGDOING [2]

| | |
|---|---|
| Michael Alston | 17 |
| Anthony Braxton | 18 |
| Shaunita Brown | 13 |
| Carrie Bryson | 10 |
| Cheryl Chambers | 15 |
| Darius Clarke | 32 |
| John Costes | 27 |
| Jonathan Earnshaw | 16 |
| Howard Franklin | 27 |
| Kevin Harris | 6 |
| Gregory Hudson | 23 |
| Allen Jones | 111 |
| Bennie Lawson | 7 |
| Ernest Mckee | 31 |
| Sylvester Miller | 2 |
| Erika Pereira | 15 |
| Kevin Charles Patrick (Pedrick) | 89 |
| Christopher Peterson | 14 |
| Peggy Porter | 37 |
| Sheldon Quick | 31 |
| Ezekiel Raspberry | 59 |
| Ramona Ross | 6 |
| William Self | 10 |
| Steven Stroman | 42 |
| Charles Thornton | 66 |
| NiDasiriDa Vitashada | 5 |
| Alonzo Williams | 8 |
| Arnita Williams | 1 |
| Arthur Williams | 39 |
| Harold Williamson | 15 |
| Clifton Wilson | 7 |
| Samuel Young | 4 |
| Ronald Bradley | 46 |
| James Chasia | 6 |
| Dorothy Douglas | 88 |
| Barbara Hailes-Payne | 35 |

**Total Number of Verified Voters Stricken:**     978
**Total Number of Signatures Remaining:**     15,575

| | |
|---|---|
| Bobbie Diggs * | 485 |
| Margol Inabinet * | 405 |

* This individual was found by the Board to have complied with the "in the presence" requirement.

2. Circulators in categories A, B, and C are also subject to general allegations of pervasive wrongdoing, together with the other disqualifying factors pertaining to the particular category.

Total Number of Verified Voters Stricken: 890
Total Number of Signatures Remaining: 14,685

## ATTACHMENT B
### CIRCULATORS IN UNAFFILIATED CATEGORY

**A. CIRCULATORS WHO SUBMITTED FALSE DECLARATIONS OF RESIDENCE ADDRESS**

| | |
|---|---|
| Charles Massenburg | 63 |
| Rommel McBride * | 7 |
| Clearness Shedrick | 26 |
| Hewitt Williams * | 34 |
| Jade Beckett | 84 |
| Vanessa Afolayan * | 144 |

    * This individual also participated in alteration of affidavits.

Total Number of Signatures: 358

**B. CIRCULATORS THAT PARTICIPATED IN ALTERATION OF AFFIDAVITS**

1) *Properly Served and Failed to Appear*

| | |
|---|---|
| Hewitt Williams * | — |
| Hope Williams [1] | 201 |
| Terrence Wilson | 17 |

    * This individual also submitted a false declaration of residence address.

Total Number of Signatures: 218

2) *Unable To Serve [2]*

| | | |
|---|---|---|
| Vanessa Afolayan * | (Abandoned Shelter) | — |
| Desi Gatling | (No Apt. Number) | 36 |
| James Hawkins | (Shelter) | 52 |
| Jessie Ryan Jones | (Doesn't Live There) | 195 |
| Michele Lee | (No Apt. Number) | 137 |
| Rommel McBride * | (No Such Address) | — |

    * This individual also submitted a false declaration of residence address.

Total Number of Signatures: 420

## C. CIRCULATORS SUBJECT TO ALLEGATIONS OF WRONGDOING

*Unable To Serve*

*Reason for Challenge*

| | | | |
|---|---|---|---|
| Douglas Avery | Petition Forgery | (No Apt. Number) | 91 |
| Michael Brown | Petition Forgery | (Does Not Live There) | 97 |
| Oscar Brown | Altered Affidavit | (Shelter) | 8 |
| Renee Brown | False Cert. Of Address | (No Apt. Number) | 28 |
| Teresa Buchanan | Affidavit Forgery | (Mother Wouldn't Accept) | 69 |
| Penta Burgess, Jr. | False Cert. Of Address | (Church/Salvation Army) | 25 |
| Robert Contee | False Cert. Of Address | (Out Of Town) | 1 |
| Cassandra Harris | Affidavit Forgery | (Shelter) | 239 |
| Darrell Hartley | Affidavit Forgery | (Church) | 315 |
| Gregory Marsh | Affidavit Forgery | (No Apt. Number) | 50 |
| Arlene Ng | Petition Forgery | (No Apt. Number) | 300 |
| Gilbert Petty | Petition Forgery | (Rehab Center) | 15 |
| Dave Rowell | Petition Forgery | (No Apt. Number) | 167 |
| Nicole Scott | Altered Affidavit | (Vacant Home) | 70 |

1. Hope Williams is purported to have signed petition sheets originally signed by Ray Kingsford, a non-resident Stars and Stripes circulator. These altered petition sheets that were conceded by the Petitioners were 2889, 2507, 3191, 2145, 2159, 2822, 1449, 1466, 3465, 3320, 3296, and 3192. An additional 201 signatures, however, were attributable to Ms. Williams but not excluded.

2. These individuals are also subject to allegations of other types of wrongdoing.

| Gregory Sims | Affidavit Forgery | (Does Not Live There) | 33 |
|---|---|---|---|
| Deloris Smith | Affidavit Forgery | (Does Not Live There) | 401 |
| Edward Swails | Affidavit Forgery | (Rehab Center) | 358 |
| James Taylor | Affidavit Forgery | (Shelter) | 334 |
| Tracy Washington | False Cert. Of Address | (Shelter) | 116 |
| Anthony Wiggins | Affidavit Forgery | (No Access To Bldg.) | 97 |
| Montrell Williams | False Cert. Of Address | (Church) | 79 |
| Terrence Wilson | Affidavit Forgery | (Shelter) | 15 |

**Total Number of Signatures:** 2,908

**Total Number Of Signatures In Categories A, B, and C: 3,904**

RUIZ, Associate Judge, concurring.

I cannot agree that the Board's disqualification of the signatures gathered by all the circulators affiliated with the Stars & Stripes operation can be squared with the demands of the First Amendment or brought within our decided cases. The Board's ultimate determination is nonetheless sustainable on a narrower ground subsumed in the Board's opinion.

Notwithstanding generalized allegations, the evidence of specific misconduct was limited to a third of the seventy-nine circulators affiliated with Stars & Stripes. The Board had testimonial evidence of wrongdoing by thirteen circulators,[1] and documentary evidence of wrongdoing by another eight circulators.[2] The Board could also properly draw inferences of wrongdoing as to six additional circulators who were subject to allegations of wrongdoing, served with subpoenas, and did not appear.[3] Because of the reliance placed on the circulators' affidavits to ensure the validity of the signatures, the Board was justified in excluding all the signatures gathered by these twenty-seven circulators whose affidavits were fraudulent or facially unreliable.[4] *See Williams v. District of*

1. These circulators gathered a total of 1773 signatures.

2. See Board's Clarification Memorandum Opinion, Attachment A, Items A(1) and B(1) & (2). These circulators, who gathered a total of 860 (296 + 418 + 146) signatures, submitted petitions with crossed-out names and addresses or petitions in which all signatures were in the same handwriting. The petitioner argues that alterations in the affidavits of circulators listed in Item B(2) could have innocent explanations and the Board therefore unjustifiably drew an inference of wrongdoing based simply on their failure to appear even though they were not served. A review of the petitions sheets submitted by these circulators shows that petitioners' argument is farfetched and that the Board had sound documentary evidence to support its decision to reject the signatures gathered by these circulators.

3. See Attachment A, Item C(1). These circulators gathered a total of 553 signatures. In supplemental filings, petitioner notes that Sheila Washington, one of the circulators who the Board claims was subpoenaed and failed to appear, did in fact testify before the Board. Because only forty signatures at issue are attributable to Ms. Washington, even taking this assertion as true, for the reasons described *infra* the proposed initiative would still fail.

4. Even though the Board no longer has a rule that expressly so provides, First Amendment concerns would caution that such a remedy is proper in the absence of countervailing proof that notwithstanding the deficiencies in the circulators' affidavits, the signatures these circulators collected were, in fact, valid. *Cf. Dankman v. District of Columbia Bd. of Elections & Ethics*, 443 A.2d 507, 513 (D.C.1981). There was no such evidence presented to the Board. Before this court, seventeen D.C. residents who signed the petitions and wanted to have their votes counted sought to intervene, but their motion was denied by my colleagues in the majority.

*Columbia Bd. of Elections & Ethics*, 804 A.2d 316, 318 (D.C.2002) (per curiam). In *Williams* we upheld the Board's decision to disqualify all the signatures gathered by three circulators based on the Board's finding that *they* had engaged in pervasive fraud, as shown by substantial evidence that was specific to those three circulators: errors and forgeries evident on the face of the petitions themselves as well as an inference from the circulators' decision not to appear after they were challenged and served with subpoenas. *See id.* at 320. Thus, we held that the Board "could disallow all of the signatures *affected by the wrongdoing.*" *Id.* at 318 (emphasis added). In contrast, there is no comparable evidence here to disqualify signatures gathered by fifty-one of the seventy-nine circulators affiliated with Stars & Stripes.[5] "At most" there is "some suspicion" that perhaps some of these circulators might have engaged in wrongdoing—associative suspicion which the Board has previously found too tenuous to disqualify presumptively valid votes, even when the persons suspected of wrongdoing were summoned, served, and did not appear. *Allen v. District of Columbia Bd. of Elections & Ethics*, 663 A.2d 489, 496 (D.C.1995) (noting presumption that voters' affidavit of residence is truthful and refusing to draw negative inference from failure to appear in response to subpoena because "there might be a variety of reasons for not attending, and the notion that a voter stayed

away because he or she had no response to petitioners' allegations is altogether speculative."). The Board's "totality of the circumstances" rationale to discredit the affidavits of all circulators merely because they were affiliated with Stars & Stripes stretches *Williams* past the breaking point and is not supported by substantial evidence. *See Williams*, 804 A.2d at 318 (noting that court must accept Board's findings of fact if supported by substantial evidence).

The most concrete example that the Board's sweeping remedy of disqualifying all Stars & Stripes circulators does not reasonably flow from the evidence is provided by the evidence of record concerning two D.C. residents, Bobbie Diggs and Margol Inabinet, who participated in the Stars & Stripes petition drive. The Board credited their testimony and found that they had substantially complied with the statutory requirement that signatures be gathered "in the presence" of a D.C. resident. D.C.Code § 1–1001.16(h)(3). Yet the Board's decision invalidated the 890 signatures they gathered.[6] By focusing on deficiencies and irregularities in the Stars & Stripes operation overall (and it appears it was far from exemplary), the Board shifted its attention away from the "signatures affected by the wrongdoing" of particular circulators—the basis for our affirmance in *Williams*—and arbitrarily struck signatures gathered by circulators it found to be reliable.[7] 804 A.2d at 318. As we have

---

5. See Attachment A, Items C(2) and D. These circulators gathered a total of 2518 (1540 + 978) signatures.

6. It could be assumed that the Board's decision to invalidate the signatures gathered by Diggs and Inabinet in the original order rested on the Board's view that all the Stars & Stripes circulators had engaged in "false advertising." Even after the Board has eschewed reliance on that rationale, however, it perseveres on the identical remedy, which as

indicated in the text, is flatly contradicted by the evidence.

7. In its opinion, the Board effectively shifted the burden to the petitioner to refute allegations that even those circulators who were not implicated and whose affidavits were sufficient on their face were tainted by misconduct. Because I sustain the Board's ultimate decision on a narrower ground I need not decide on the extent, if any, to which the Board properly could rely on the fact that

previously emphasized, "consistent with the overall tenor of the Initiative Act which prevents 'harmless error' in the signature collection process from vitiating the validity of the petitions ... the paramount concern is with the validity of the signatures." *Dankman, supra* note 4, 443 A.2d at 515. The Board undoubtedly has constitutional space and statutory authority to oversee the petitioning process to ensure its integrity, *see Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 191 n. 10, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), but the overarching interest lies in protecting the franchise of those D.C. residents who signed the petitions. Because this is "core political speech" protected by the First Amendment, any remedy that infringes upon it must be narrowly tailored to the evidence of wrongdoing. *See id.* at 192, 119 S.Ct. 636. Where First Amendment concerns are implicated we "must make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expres-

sion." *Guilford Transp. Indus, Inc. v. Wilner*, 760 A.2d 580, 592 (D.C.2000). Although the Board expressly recognized the important First Amendment rights at stake, as I have discussed its chosen remedy went beyond what was supported by the evidence—indeed beyond what was necessary to decide the precise question before it. Particularly where the signatures collected do not decide an election, but merely determine whether the issue is to be presented to the full electorate for a vote, the First Amendment balance should be struck in favor of speech. *See Citizens Against Legalized Gambling v. District of Columbia Bd. of Elections & Ethics*, 501 F.Supp. 786, 789 (D.D.C.1980). In the words of Justice Brandeis, "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). The Board's overly-broad remedy to address what it

petitioner did not present evidence to counter allegations of a pattern of fraud in the Stars & Stripes operation. If required to do so, I would think it difficult, on this record, to sustain the broad "missing witness" inference made by the Board and that my colleagues condone. That inference is valid where the witness is "peculiarly within the control" of a party who has reason to believe that the witness would have evidence "relevant and material to a disputed issue in the case." *Thomas v. United States*, 447 A.2d 52, 57 (D.C. 1982). But it might not have been apparent to the petitioner during the hearing that following a remand by this court the Board would in this case for the first time decide to invalidate a great number of signatures based on a "totality of the circumstances" approach that extrapolated known misconduct by twenty-seven circulators to taint the efforts of fifty-one others based on their common affiliation with an umbrella organization. Moreover, although the circulators involved in the petition drive were paid by the Stars & Stripes umbrella organization, they were not "pecu-

liarly within its control" as they were not employees in the traditional sense. As is apparent from the record, a number of the circulators (some of whom lived in homeless shelters and halfway houses and were likely un- or under-employed) formed only a loose association with the organization when they took advantage of an opportunity to make some money by signing up on short notice to work on the petition drive for a few days. There undoubtedly were others, the professional non-residents, who are more permanently associated with Stars & Stripes, notably Michael Jones. In light of the testimony directly linking Mr. Jones to gross improprieties, the Board could well burden petitioner's cause with a negative missing witness inference when he failed to appear at the Board's hearing. But even that inference could take the Board only so far as there was little evidence of how many circulators were in fact tainted by his methods, and whether they were in addition to the ones already implicated.

sincerely perceived to be serious shortcomings in the way the petition circulators were managed, placed greater emphasis on regulating the process than in ascertaining whether there were the requisite number of signatures to allow the initiative to enter the sphere of public debate.

My conclusion that the evidence does not support the Board's decision to invalidate all the signatures gathered by circulators identified with Stars & Stripes, does not mean, however, that we cannot sustain its ultimate determination that petitioner failed to gather the number of signatures necessary to place the slots initiative on the November ballot. As my colleagues in the majority recognize, there is substantial evidence in the record and analysis in the Board's opinion to justify affirmance on a narrower basis. *See Securities & Exchange Comm'n v. Chenery*, 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (holding that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."). The Board's Clarification Memorandum Opinion following remand notes that there were documented irregularities in the affidavits of thirteen circulators who were not linked to Stars & Stripes.[8] Because the decisive inquiry consistent with the First Amendment is not the quality (or lack thereof) in the training and supervision provided by the umbrella organization, but the validity of the signatures as attested by reliable circulators' affidavits, the 996 signatures gathered by those thirteen circulators— whatever their affiliation—should have been excluded by the Board. This is not a matter for administrative discretion, as the Board must be satisfied that the proffered

signatures are valid either by reliance on the circulators' affidavits or through its own random and statistical sampling. *See* D.C.Code § 1–1001.16(h) & (*o*)(1). When these 996 signatures are added to the 3186 signatures gathered by Stars & Stripes circulators as to whom there was sufficient evidence of wrongdoing on the record, see footnotes 1, 2 & 3, *supra*, the number of signatures fell to 17,097, below the requisite 17,599 signatures. It is on that narrower ground subsumed within the Board's Clarification Memorandum Opinion that I affirm the Board's conclusion that petitioners presented an insufficient number of signatures to place the initiative on the ballot.

---

8. See Board's Attachment B, items A & B. These circulators gathered a total of 996 (358 + 218 + 420) signatures.